**STATE of Missouri, Respondent,**

v.

**Clarence R. DEXTER, Appellant.**

**No. 74398.**

Supreme Court of Missouri,
En Banc.

Oct. 21, 1997.

Janet M. Thompson, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for Respondent.

COVINGTON, Judge.

Appellant, Clarence Richard Dexter, appeals the judgment from his conviction for first degree murder. Appellant was found guilty after a jury trial and sentenced to death for the murder of his wife, Carol Dexter. Appellant appeals his conviction, his sentence, and the overruling of his Rule 29.15 post-conviction motion. Because the state violated appellant's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution by commenting on his silence after arrest and *Miranda* warnings, *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), this Court reverses the judgment and conviction and remands for a new trial. Because of this ruling, appellant's appeal of the overruling of his Rule 29.15 motion is dismissed as moot.

Appellant, Clarence Richard Dexter, was charged by indictment with the class A felony of murder in the first degree, in violation of section 565.020, RSMo 1986, and the felony of armed criminal action, in violation of section 571.015, RSMo 1986. The cause went to trial before a jury on July 8, 1991, but a mistrial was declared when the jury could not reach a verdict. The cause again went to trial before a jury on October 7, 1991, and appellant was found guilty of murder in the first degree.

■ The sufficiency of the evidence is at issue. For the purpose of stating the facts in this case, however, the evidence is viewed in the light most favorable to the verdict. *State v. Storey,* 901 S.W.2d 886, 891 (Mo. banc 1995). On November 18, 1990, appellant and his wife of twenty-two years, Carol Dexter, began their day by making pumpkin bread

and then having a meal. At about 3:00 p.m., the retirement home where Ms. Dexter was engaged in part-time work telephoned to ask her to come in for an unscheduled shift. She left for work at about 3:45 p.m. Ms. Dexter's son, Michael Benedetti, left the house to join a friend for dinner at about 5:45 p.m. Benedetti had declined an invitation to dinner with his mother and appellant because appellant and Ms. Dexter had been arguing that morning, and Benedetti wanted to avoid the tension. Upon leaving the house, Benedetti observed that appellant was watching television in the living room.

At 8:33 p.m., appellant called to report that his wife had been shot. The first two police officers on the scene reported that upon entering the garage of the house where appellant and Ms. Dexter resided, they observed Ms. Dexter lying next to the car in a "flood" of blood. Ms. Dexter had multiple gunshot wounds and a three inch hole caused by a blunt trauma to her head. In a bucket on the floor next to the victim, the officers found a blood-stained hammer. The officers also discovered a .32 caliber semi-automatic pistol, registered to appellant, in a grass catcher on top of a lawnmower near the "people door" located in the garage.

One of the officers had appellant, who appeared upset, sit down in the garage. Soon thereafter, appellant pointed out that the "people door" was ajar. The officer noted that the door was ajar about three inches and that a pane of plexiglass and the inside pane molding near the door knob were missing.

During their search of the residence, the officers found a note under the mattress in the master bedroom, in the victim's handwriting, listing things missing from her marriage. The officers also observed an empty handgun case on the bed and a sack of groceries in the dining room containing items that appellant said he had purchased at Food Barn that evening.

On the floor in front of the stairs leading into the house from the garage, officers recovered a spent bullet and shell casing. On the second step, they recovered another spent bullet, and, further up, another spent shell casing. On the seventh step a portion of a tooth was found. At the top of the stairs, inside the house, they found another spent shell casing.

In connection with searching the car in the garage, officers found drops of blood on the driver's side front bumper. Inside the car, blood was smeared in various areas of the driver's seat, door, dashboard, and window. Items in the passenger seat had blood on them. The blood in the car, however, was not a fatal quantity.

The evidence indicates that Ms. Dexter was first shot on the steps, then bludgeoned to death. As noted above, in addition to the bullet wounds sustained by the victim, she had a large, open skull fracture on the back of her head with multiple marks indicating where large pieces of the skull were depressed with brain matter protruding. It appears that the blunt trauma to the skull caused the victim's death.

The state introduced blood analysis and hair analysis evidence, that will be explained in greater detail below.

Appellant testified at trial that he did not kill his wife and that he left the house for the grocery store at approximately 7:30 to 7:35 p.m. He returned to find her body at about 8:30 p.m. Detail with respect to appellant's evidence and theory of defense will also be set forth below.

At the close of all the evidence, instructions, and argument, the jury returned a guilty verdict for murder in the first degree. After deliberation subsequent to the penalty phase evidence, the jury found that they were incapable of agreeing on the appropriate punishment. The trial court found that the state had proven beyond a reasonable doubt the aggravating circumstance that the murder involved depravity of mind and sentenced appellant to death.

## II.

Appellant alleges that the trial court plainly erred in failing *sua sponte* to declare a mistrial after the prosecutor admitted evidence and made closing arguments that referred to appellant's post-arrest, post-*Miranda* warnings silence. Appellant claims that the state's references to his post-*Mi-*

*randa* silence violated his rights against self-incrimination and his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and article I, § 19 of the Missouri Constitution.

Specifically, appellant complains of the emphasized portion of the following testimony by Detective Mansell:

A. Yes, sir, I asked him several times—told him several times that because of the evidence found at the scene and also the gun found at the scene, which was hidden in the basement and we believed was used against his wife, I asked him—told him because of these facts, an item was taken out of his truck which appeared to have blood on it, and that I didn't feel he was being truthful. *At that time I placed him under arrest in regards to this homicide and at that time he stated he would not answer any further questions without his attorney."* (emphasis added).

Q. Okay. Did you ask Mr. Dexter if he had returned to his truck after arriving home?

A. Yes, I did, and he stated he had not.

Q. All right. Did you talk with Mr. Dexter any further?

A. *I talked to him for approximately an hour and twenty minutes, until the time he requested an attorney, and at that time the questioning ended."* (emphasis added).

Appellant also complains of the portion of the prosecutor's cross-examination and recross examination of him in which the trial court sustained the defense counsel's objection to the following line of questioning:

Q. [Prosecutor] Do you remember talking to Detective Mansell and telling him your story of what happened?

A. Yes, sir.

Q. And do you remember later on he came in and said hey, this doesn't jive, remember that?

A. Yes, sir.

Q. He said I find a lot of things here that just don't fit your story, right?

A. Uh-huh.

Q. He said we found blood all over your blue jeans here, blood all over your shoes, blood in your coat, found some bloody T-shirts, one in the trunk, one under your car—truck seat, blood on the pedals of the truck that you say you never got back into. What other explanation did you offer?

Then again during his recross examination of appellant, the prosecutor questioned appellant as follows:

Q. Now you talked to Detective Mansell twice, didn't you, at least twice? The first interview was what happened, then he came back later and said [sic] found a bunch of stuff that just doesn't jive?

A. Yes.

Q. And that second time he told you that there was blood on the pedals of the truck, found the T-shirt with your wife's blood under the seat, and the T-shirt with the blood in the trunk, and the glove, and the gun that fell in the corner, and all that. Did you then at that point, after they said hey, your story doesn't match, did you then deny you killed your wife?

A. Yeah.

Q. And you're sure of that?

A. I denied killing my wife at any time that I was asked that question. I denied it.

Q. But after you were confronted with all of this evidence that said did not jive with your story, did you then at that point deny killing with [sic] your wife?

Defense counsel immediately objected to these questions on both cross examination and recross examination, asserting that the response would be that appellant stated that he wanted to talk to an attorney. The trial court sustained the objections and told the jury to disregard the questions. Additionally, during a conference at the bench during the recross examination after appellant's objection, the trial judge instructed the prosecutor to tell Detective Mansell, if he was called as a rebuttal witness on recross examination regarding this issue, "to stay away from anything that has to do with the point where appellant refused to talk with [sic] an attorney."

Appellant also points to the prosecutor's remarks during guilt-phase closing argument in which he referred the jury to Detective Mansell's report (admitted into evidence as Exhibit 154) and stated,

Now is the Defendant telling you the truth? I direct you to Detective Mansell's statement.

Then in his rebuttal argument, the prosecutor said to the jury:

Look at Mansell's statement when you get back to the jury room to see what the Defendant said or didn't say, did or didn't do look at Mansell's statement. See what the Defendant told him and didn't tell him.

The detective's statement contained the following information:

Mr. Dexter was confronted with the fact that officers had recovered a T-shirt from under the front seat of his pickup truck, which appeared to have blood spots on it. Mr. Dexter stated he did not know anything about it. He was also confronted with the fact that a .32 caliber automatic pistol had been found in the basement, inside a grass catcher bag, on top of the lawnmower near the walk-in door. Mr. Dexter did not comment on knowing anything about that. He was also confronted with the fact that several items of blood clothing were found in a chest, also close to the lawnmower. He was also informed that one of the items of clothing found in the chest was a very large T-shirt, extra large size, which is the size that Mr. Dexter wears. Mr. Dexter stated he knew nothing about it. Mr. Dexter was told that from the evidence found at the scene it did not appear that he was being completely truthful with the officers in regards to what he knew about the victim's death. He stated that he had already told the officers about what had occurred. Mr. Dexter did not confirm or deny that he had something to do with the victim's death. Mr. Dexter was asked about several small scratches on his index fingers of both hands. He stated that during the process of making the pumpkin bread they used coffee cans and that when he was cleaning the coffee cans out he was cut by the inside edges of the cans.

Due to the evidence, at 0140 hours, Detective Mansell officially placed Mr. Dexter under arrest for the homicide of his wife, the above captioned victim. At that time Mr. Dexter stated that he didn't want to talk any more until he had an attorney. At that time the questioning was stopped and Mr. Dexter was taken to the Detention Unit.

The last sentence in the report states:

During the interview of Mr. Dexter he was calm most of the time until being pinned down on his participation in his wife's death. When the officers would ask him direct questions if he had anything to do with it he would become very nervous and would not answer.

■ The landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that those taken into police custody be informed that they have the right to remain silent, that anything they say can be used against them and that they have the right to counsel before submitting to interrogation. *Id.* at 467–73, 86 S.Ct. at 1624–27. If the person being questioned "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; ..." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627.

■ In *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, is fundamentally unfair and violates the due process clause of the Fourteenth Amendment. *Id.* at 619, 96 S.Ct. at 2245 This rule rests on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 638–39, 88 L.Ed.2d 623 (1986)(quoting *South Dakota v. Neville*, 459 U.S. 553, 565, 103 S.Ct. 916, 923–24, 74 L.Ed.2d 748 (1983)).

■ For purposes of analyzing when a defendant has invoked his right to silence as assured by the *Miranda* warning, the United States Supreme Court noted that "with respect to post-*Miranda* warnings 'silence,' si-

lence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Wainwright v. Greenfield,* 474 U.S. at 295 n. 13, 106 S.Ct. at 640 n. 13; *see also State v. Tims,* 865 S.W.2d 881, 885 (Mo.App.1993). When analyzing a *Doyle* violation claim, courts must "treat a defendant's invocation of his *Miranda* rights not as a statement, but as post-*Miranda* warnings silence." *Fields v. Leapley,* 30 F.3d 986, 990 (8th Cir.1994)(citing *Greenfield,* 474 U.S. at 295 n. 13, 106 S.Ct. at 640, n. 13

Relying on the *Doyle* notion of fundamental unfairness, Missouri cases have held that post-*Miranda* silence cannot be used as evidence to incriminate the defendant. *See State v. Zindel,* 918 S.W.2d 239 (Mo. banc 1996); *State v. Frazier,* 927 S.W.2d 378, 379 (Mo.App.1996). Missouri courts have held that a witness's testimony that describes the conclusion of an interrogation after the defendant revokes the waiver of his right to remain silent "must be carefully scrutinized." *Frazier,* 927 S.W.2d at 380(quoting *State v. Tims,* 865 S.W.2d at 886. In *Tims,* the court of appeals found a police officer's testimony improper where the police officer testified that defendant refused to answer any further questions and requested an attorney when asked about discrepancies in his confession. In *Frazier,* the Missouri Court of Appeals, Western District, reasoned that evidence "which reveals that the defendant [is] failing to answer a direct charge of guilt is improper." *Frazier,* 927 S.W.2d at 380. The *Frazier* court further held that evidence describing the conclusion of an interrogation that creates an inference of guilt is not admissible. *Id.* In *State v. Whitmore,* 948 S.W.2d 643 (Mo.App.1997), the court of appeals found that a detective's repeated references to the defendant's request for an attorney and the prosecutor's emphasis during closing argument on this evidence created an impermissible inference of guilt, thereby violating defendant's constitutional rights. *Id.* at 648. Additionally, in *State v. Martin,* 797 S.W.2d 758 (Mo.App.1990), the court of appeals found a *Doyle* violation when a police officer testified to the defendant's request for an

attorney after giving a detailed account of defendant's confession. *Id.* at 763–64.

■ Applying the foregoing principles to the facts of this case, there is no doubt that the state repeatedly committed *Doyle* violations. First, the State violated *Doyle* when Detective Mansell during his direct examination twice referenced appellant's refusal to speak about the events surrounding his wife's murder without an attorney present. Detective Mansell's testimony was as follows:

A. Yes, sir, I asked him several times— told him several times that because of the evidence found at the scene and also the gun found at the scene, which was hidden in the basement and we believed was used against his wife, I asked him—told him because of these facts, an item was taken out of his truck which appeared to have blood on it, and that I didn't feel he was being truthful. *At that time I placed him under arrest in regards to this homicide and at that time he stated he would not answer any further questions without his attorney."* (emphasis added).

Q. Okay. Did you ask Mr. Dexter if he had returned to this truck after arriving home?

A. Yes, I did, and he stated he had not.

A. All right. Did you talk with Mr. Dexter any further?

A. *I talked to him for approximately an hour and twenty minutes, until the time he requested an attorney, and at that time the questioning ended."* (emphasis added).

The detective's testimony described how appellant refused to speak without an attorney directly after the detective had summarized the evidence implicating appellant in his wife's murder and confronted appellant with the statement that he did not believe appellant was being truthful. The detective's testimony regarding appellant's invocation of his right to remain silent, therefore, plainly created an inference of guilt. *See Frazier,* 927 S.W.2d at 380; *Tims,* 865 S.W.2d at 886.

■ The next *Doyle* violation occurred when the prosecutor cross-examined appellant as follows:

Q. [Prosecutor] Do you remember talking to Detective Mansell and telling him your story of what happened?

A. Yes, sir.

Q. And do you remember later on he came in and said hey, this doesn't jive, remember that?

A. Yes, sir.

Q. He said I find a lot of things here that just don't fit your story, right?

A. Uh-huh.

Q. He said we found blood all over your blue jeans here, blood all over your shoes, blood in your coat, found some bloody T-shirts, one in the trunk, one under your car—truck seat, blood on the pedals of the truck that you say you never got back into. What other explanation did you offer?

Then, again, during the recross examination, the prosecutor questioned appellant as follows:

Q. Now you talked to Detective Mansell twice, didn't you, at least twice? The first interview was what happened, then he came back later and said [sic] found a bunch of stuff that just doesn't jive?

A. Yes.

Q. And that second time he told you that there was blood on the pedals of the truck, found the T-shirt with your wife's blood under the seat, and the T-shirt with the blood in the trunk, and the glove, and the gun that fell in the corner, and all that. Did you then at that point, after they said hey, your story doesn't match, did you then deny you killed your wife?

A. Yeah.

Q. And you're sure of that?

A. I denied killing my wife at any time that I was asked that question. I denied it.

Q. But after you were confronted with all of this evidence that said did not jive with your story, did you then at that point deny killing with [sic] your wife?

The questioning, although sustained upon objection, highlighted that appellant did not offer an exculpatory statement in response to the detective's allegations that his statements were untruthful. Appellant failed to offer such an explanation because he instead invoked his *Miranda* rights by asking for an attorney.

Finally, during closing argument, the prosecutor again presented the point that he had developed throughout the trial by emphasizing appellant's post-*Miranda* silence:

Now is the Defendant telling you the truth? I direct you to Detective Mansell's statement.

Then again in his rebuttal argument, the prosecutor said to the jury:

Look at Mansell's statement when you get back to the jury room to see what the Defendant said or didn't say, did or didn't do look at Mansell's statement. See what the Defendant told him and didn't tell him.

■ The state argues that no *Doyle* violation occurred because appellant had waived his rights before speaking with Detective Mansell. The state correctly notes that at 11:20 p.m. on the evening of the murder, after Detective Mansell advised appellant of his *Miranda* rights, appellant signed a waiver form agreeing to talk to the detective. The state disregards, however, the fact that appellant revoked the waiver of his right to remain silent at the point during the interview when he requested his attorney; therefore, the evidence must be "carefully scrutinized." *See State v. Tims*, 865 S.W.2d at 886. The *Tims* court noted that evidence in regard to the conclusion of an interrogation that reveals that the defendant was failing to answer a direct charge of guilt is improper. *Tims*, 865 S.W.2d at 886. In *Tims*, the court of appeals found that a request for an attorney "is an effective reclamation of defendant's right to silence and thus is not proper comment in testimony." *Id.* The *Tims* court, therefore, ruled that the trial court should have restricted both the prosecutor's question and the witness' response to exclude this request. *See also State v. Frazier*, 927 S.W.2d at 380; *U.S. v. Williams*, 556 F.2d 65, 66–7(D.C.Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070(1977)(finding testimony about the defendant's desire or request for a lawyer error). Thus, appellant effectively revoked his waiver by requesting an attorney, and the prosecutor's and Detec-

tive Mansell's references to this request constitute *Doyle* violations.

The state also claims that the prosecutor's statements during closing argument referred only to appellant's silence in response to certain questions posed during the interrogation after he had waived his rights. Whether the prosecutor was referring in closing argument to appellant's silence before or after he reinvoked his right to silence by asking for his lawyer is unclear. In any event, the prosecutor's comments during closing argument clearly referred to Detective Mansell's statement, which contained descriptions of both appellant's silence in response to certain questions and his request for an attorney in response to allegations that he was untruthful. In view of the prosecutor's other references throughout the trial to the time when appellant clearly revoked the waiver of his *Miranda* rights by asking for an attorney, however, a juror would be lead by the prosecutor's statements during closing argument to consider appellant's request for an attorney that effectively revoked the waiver of his *Miranda* rights.

▮ Once a *Doyle* violation has been found, this Court has the discretion to review the violation or violations in the context of the entire record for plain error that affects substantial rights and constitutes a manifest injustice. Rule 30.20. *See State v. Simmons*, 955 S.W.2d 752, 762 (Mo. banc 1997). The question is whether the evidence had a decisive effect on the jury. *State v. Davis*, 566 S.W.2d 437, 447 (Mo. banc 1978)(holding

that prosecutor's argument using impeaching statements as substantive evidence constituted plain error because it had a decisive effect on the jury). *See also State v. Debler*, 856 S.W.2d 641, 657 (Mo. banc 1993)(finding plain error requiring reversal of death sentence when trial court admitted evidence of an unconvicted crime during penalty phase); *State v. Zindel*, 918 S.W.2d 239, 241–44 (Mo. banc 1996)(finding plain error because of the prosecutor's use of the defendant's post-arrest silence to show sanity). To determine the effect on the jury in reviewing *Doyle* violations for plain error affecting substantial rights and resulting in manifest injustice, this Court must consider the following factors: (1) whether the government made repeated *Doyle* violations, (2) whether any curative effort was made by the trial court, (3) whether the defendant's exculpatory evidence is transparently frivolous, and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming. *See Brecht v. Abrahamson*, 507 U.S. 619, 639, 113 S.Ct. 1710, 1722–23, 123 L.Ed.2d 353 (1993); *U.S. v. Wiley*, 29 F.3d 345, 349 (8th Cir.) *cert. denied*, 513 U.S. 1005, 115 S.Ct. 522, 130 L.Ed.2d 427 (1994).[1]

▮ This court concludes that the *Doyle* violations in this case violated appellant's substantial rights. First, as noted above, the prosecutor developed a theme that he carried throughout all phases of the trial by referring to appellant's post-*Miranda* silence to infer appellant's guilt and impeach his testimony. As set forth in detail above, initially, the prosecutor introduced the evidence during the direct examination of Detective Man-

---

1. When the error is preserved, the proper standard to apply is the *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), harmless-beyond-a-reasonable-doubt standard where the state bears the burden of proving that a federal constitutional error was harmless beyond a reasonable doubt. *See Bass v. Nix*, 909 F.2d 297, 304 (8th Cir.1990). This Court finds that the factors that inform the analysis for applying the *Chapman* standard to preserved error *Doyle* violations, however, are the same as those used to determine whether a nonpreserved *Doyle* violation error is a plain error affecting substantial rights and resulting in manifest injustice. These factors, once again, include the following: (1) whether the government made repeated *Doyle* violations, (2) whether any curative effort was made by the trial court, (3) whether the defen-

dant's exculpatory evidence is 'transparently frivolous,' and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming. *Bass*, 909 F.2d at 305; *see also Wiley*, 29 F.3d at 349. The federal courts also use the same four factors to inform their analysis when applying the *Kotteakos* harmless error standard on collateral review of *Doyle* violations. *Brecht*, 507 U.S. at 639, 113 S.Ct. at 1722–23. The harmless error inquiry under *Kotteakos* is whether the *Doyle* error "had a substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). This standard conforms to this Court's Rule 30.20 standard for plain error—error that affects substantial rights and constitutes a manifest injustice.

sell. He then offered the detective's report into evidence, and it was admitted. Later, during both the cross-examination and re-cross examination of appellant, the prosecutor highlighted appellant's post-*Miranda* silence. Finally, during his closing arguments, he reemphasized the post-*Miranda* silence evidence introduced during the case. He then referred to Exhibit 154, Detective Mansell's report, and instructed the jury to look at it and refer to it during its deliberations. To repeat, the references to appellant's post-*Miranda* silence were emphasized throughout the trial. The effect of the emphasis on the jury is patent—the jury specifically requested Detective Mansell's report, Exhibit 154, during its deliberations.

Second, curative efforts were minimal. The court admonished the jury to disregard the questions posed to appellant during both cross-examination and recross examination that would have required appellant to refer to his post-*Miranda* silence. The prosecutor's mere asking of the questions, however, had already created an inference of guilt by directing the jury to be suspicious of appellant's lack of a response to the summary of the evidence. No other curative efforts were made.

Third, appellant's defense was not 'transparently frivolous.' He contended that he could not have committed the murder within the time frame shown by the state's evidence. Appellant produced evidence of a cash register receipt from Food Barn showing 8:11 p.m. as the time of his making of the grocery purchases he claimed to have made on the evening of the murder. Appellant verified the purchases detailed on the receipt. He claimed to have left his house at 7:45 p.m. for Food Barn, returning sometime around 8:30 p.m. Meanwhile, the victim "clocked out" from work a little after 7:45 p.m. that evening. The state's test drive from the victim's workplace to her home where the murder occurred took nine minutes sixteen seconds, while the test drive from the home to the parking lot of the Food Barn took seven minutes six seconds. The autopsy report showed the marked time of injury as 8:15 p.m. Therefore, as the State pointed out, the maximum time in which the victim

and appellant could have been at home together before appellant left for Food Barn was nine minutes. As appellant noted, however, this nine minutes did not account for appellant's walking time from the car to the store and back, appellant's shopping time, the victim's walking time from where she clocked out to the door of her workplace, special traffic conditions (the state's test drive from the victim's workplace took place at 6:00 a.m. while the test drive to Food Barn took place at 7:00 a.m.), or evidence that the victim stopped for coffee on her way home from work. At a minimum, the evidence established that appellant would have had a maximum of nine minutes to shoot the victim at the top of the stairs to the basement, pursue her downstairs and through the garage, shoot her three more times, possibly change his shirt, and leave the house for the Food Barn. It cannot be said that the time frame defense evidence is "transparently frivolous."

The fourth and final step of the analysis is to determine whether the state overwhelmingly established appellant's guilt. Certainly, although appellant disputes it, the state made a submissible case, viewing the evidence in the light most favorable to the verdict, accepting as true all of the state's evidence, giving the state the benefit of all the inferences therefrom, and disregarding all evidence and inferences contrary to a finding of guilt. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). The evidence is as outlined in the statement of facts set forth above. In support of its case, the state presented extensive blood, blood spatter, and hair evidence from which the jury could infer that appellant committed the crime. Analysis of the hair found on the two T-shirts (matching appellant's size—extra large) taken from the foot locker in the garage and from appellant's truck indicate hair consistent with appellant's. The state heavily relies on the T-shirt dotted with a spot of the victim's blood found in appellant's truck. The gun and hammer used in the crime belonged to appellant and the victim. Appellant's jeans had, in addition to contact smears, high-velocity spatters that could not be explained by simple contact with the vic-

tim's body. The jury could have inferred that appellant displayed a consciousness of guilt when he did not affirmatively confirm or deny knowledge about certain items of evidence and simply "hung his head" when confronted with this evidence. The jury could infer additional evidence of appellant's guilt by reason of the fact that the victim must have known and approached her attacker since she was shot upon entry to her house at close range. Appellant's wife had recently expressed her dissatisfaction with the marriage.

The question is not, however, whether the state made a submissible case. The question is whether there was overwhelming evidence of guilt. There is no confession in this case. There are no eyewitnesses. *See State v. Sims,* 764 S.W.2d 692, 694 (Mo.App.1988)(finding overwhelming evidence of guilt where defendant signed a written confession); *State v. Huckleberry,* 823 S.W.2d 82, 86 (Mo.App.1991)(finding overwhelming evidence of guilt in prosecution for unlawful use of a weapon where five police officers and defendant's wife testified about the threatening manner in which defendant exhibited a shotgun); *State v. Babbitt,* 639 S.W.2d 196, 197 (Mo.App.1982)(finding overwhelming evidence of guilt where victim identified defendant and defendant signed a written confession); *State v. Hamell,* 561 S.W.2d 357, 364–5 (Mo.App.1977)(finding overwhelming evidence of guilt where there was a positive identification, and defendant's palmprint was found at the scene); *State v. Smith,* 609 S.W.2d 478, 480 (Mo.App.1980)(finding overwhelming evidence of guilt where defendant had sworn during testimony that he committed the offense); *But cf. State v. Ellinger,* 549 S.W.2d 136, 140 (Mo.App.1977)(finding no overwhelming evidence of guilt in "close case" where the prosecutor's remarks may have made the difference between a hung jury or an acquittal); *State v. Sladek,* 835 S.W.2d 308, 313 (Mo. banc 1992)(finding new trial necessary because, although the state introduced sufficient evidence to make a submissible case, the fact finder was influenced by the inadmissible evidence to reach a finding of guilt). Certainly, eyewitnesses and confessions are not required; in fact, the report-

ers are replete with cases where circumstantial evidence of guilt is overwhelming. But "overwhelming evidence of guilt" means at a minimum that there is sufficient evidence to support a conviction without consideration of the inadmissible evidence, in this case the inadmissible references to appellant's silence. There must be no reasonable doubt that appellant committed the crime, and the degree of prejudice that occurred by use of the inadmissible references to appellant's post-*Miranda* warnings silence must be insubstantial.

"Overwhelming evidence of guilt" is no easier to define than "manifest injustice," both being standards entirely dependent upon the facts of a particular case. "Manifest injustice" is a concept appellate courts may find impossible to define, but appellate courts "know it when they see it." *Frazier,* 927 S.W.2d at 384(quoting 3A Charles Alan Wright, *Federal Practice and Procedure,* Sec. 856 (1982)). Likewise, a test to determine whether there is overwhelming evidence of guilt in a particular case is not easily articulated. Perhaps the most vivid articulation in Missouri's jurisprudence is that expressed in *State v. Martin,* 797 S.W.2d at 765 (Mo.App.1990), "if [defendant] were tried one hundred times on this evidence, with or without [the detective's] testimony, she would be convicted one hundred times." (quoting *State v. Smart,* 756 S.W.2d 578, 582 (Mo.App.1988) (NUGENT, J. concurring)).

Appellant points to the fact that the state's evidence failed to show that his fingerprints were on the gun or the hammer found in the garage. There was no blood on the shirt he was wearing, and the state did not introduce evidence of gunshot residue present on his clothing or skin. Appellant further points out that the state's evidence focused mainly on blood. Blood matching that of the victim found on the left leg of appellant's jeans contained contact stains mixed with some very small splatters. Appellant admitted that he straddled his wife's body, picked her up, and turned her over. Appellant notes that the evidence showed that there was only a single splatter stain (indicating a blood drop of high velocity hitting a surface) ten

inches above the cuff on the right leg of his jeans and matching the victim's blood; he explains the blood as possibly having splashed there when he stepped into a puddle of blood or gushed there when he turned the bleeding victim. Additionally, appellant brought out that the white glove and T-shirt located in the trunk in the garage showing blood matching that of the victim could not be conclusively connected to him. Although traces of unidentifiable blood were found on the inside right pocket of appellant's jacket, appellant points out that these traces could not even be identified as human blood and that appellant had a small cut on his finger that could have been the source of this small spot. Further, appellant revealed that some items tested for blood evidence proved to contain blood other than the victim's. The T-shirt found in appellant's truck contained at least one spot of blood matching the victim's blood group, but, as appellant demonstrated, the majority of tests revealed blood groups other than the victim's, and the shirt contained only six total spots of blood. Moreover, appellant pointed out that the blood type on appellant's shoes did not match the victim's blood type. Finally, although the foot pedals and floor mat in appellant's truck reacted to Luminol tests, appellant introduced testimony that Luminol also reacts to substances used at his workplace such as turpentine and paint thinner. Additionally, appellant explained that the blood residue present from a time when he had gone hunting or fishing could have produced the positive Luminol reaction.

Taking into account the state's evidence and appellant's exculpatory evidence, it cannot be said that "if [appellant] were tried one hundred times on this evidence, with or without [the detective's] testimony, [he] would be convicted one hundred times." This Court concludes that there is not overwhelming evidence of appellant's guilt.

Because of: (1) the repeated *Doyle* violations; (2) the de minimus curative efforts together with the inescapable conclusion that the jury considered the *Doyle* violation evidence; (3) the appellant's exculpatory evidence; and (4) the fact that the evidence of guilt is not overwhelming when the *Doyle*

violation evidence is exorcised, this Court finds that the *Doyle* violation errors affected appellant's substantial rights and resulted in manifest injustice, requiring reversal.

## III.

Of the remaining points on appeal, only one need be addressed. It deals with plain error review of failure to submit instructions on lesser-included offenses. Appellant claims that the trial court plainly erred in failing to instruct the jury on second degree murder or on voluntary manslaughter in that the evidence would have supported the submission of the instructions.

If the error in this case were preserved, the analysis would be guided by that of *State v. Santillan*, 948 S.W.2d 574 (Mo. banc 1997). In *Santillan*, both the appellant and the state requested the second degree instruction. This Court agreed that a second degree murder instruction should have been submitted:

> In most cases, indirect evidence of deliberation also supports a finding of lack of deliberation. A jury may draw different inferences from the facts on the issue of whether the defendant deliberated. *State v. Stepter*, 794 S.W.2d 649, 653 (Mo. banc 1990). Deliberation is, therefore, a question of fact for the jury and a second degree murder instruction is usually warranted.... Section 556.046.2 ... requires only that there be a basis for the jury to acquit on the higher offense in order for the court to submit an instruction for the lesser included offense. If a reasonable juror could draw inferences from the evidence presented that the defendant did not deliberate, the trial court should instruct down.

*Id.* at 576.

This Court need not undertake a *Santillan* analysis in this case. This case is entirely distinguishable from *Santillan* for the reason that appellant failed to preserve his claim of instructional error by failing to request or timely submit any instructions on the lesser-included offenses. Appellant's failure to request submission of lesser-included offenses is in keeping with his theory of the case that he did not commit the crime. The appellant in *Santillan* had the same theory. He prop-

erly understood, however, that the jury could disbelieve his theory. He requested the second degree instruction.

■ This Court will not convict the trial court of plain error in this case for failing *sua sponte* to submit instructions for lesser-included offenses. A defendant is permitted to adopt a trial strategy and to attempt to persuade the jury of it. When the failure to request a lesser-included instruction is a matter of strategy, the court should not second guess the defendant's counsel. Rather, the defendant may determine whether he will give the jury an "all or nothing" choice, or request submission of lesser-included offense instructions. Once having made the determination, the defendant may be held to accept the consequences of that decision.

■ Due process considerations do not require that this Court employ a rule that encourages a defendant to refrain in every case from requesting submission of lesser included offense instruction, see the trial through to conclusion, then seek to convict the trial court of plain error after the jury returns a guilty verdict. This is true particularly where, as in this case, appellant did not inquire of trial counsel during the postconviction relief proceedings as to counsel's reasons for not requesting a lesser-included offense instruction. Under these circumstances, this Court will presume that counsel's decision was reasonable trial strategy. *See State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). For these reasons, the trial court did not err in failing *sua sponte* to submit lesser-included offense instructions, nor can trial counsel be convicted of ineffective assistance in this respect.

### IV.

Because repeated *Doyle* violations in this case resulted in manifest injustice, the judgment as to the conviction for first degree murder is reversed and the cause remanded for a new trial.

All concur.