**STATE of Missouri, Plaintiff–Respondent,**

v.

**David Charles MASON, Defendant–Appellant.**

No. SD 31993.

Missouri Court of Appeals,
Southern District,
Division Two.

July 30, 2013.

Margaret M. Johnston, Columbia, MO, for Appellant.

Andrew C. Hooper, Jefferson City, MO, for Respondent.

DON E. BURRELL, J.

David Charles Mason ("Defendant") was convicted of first-degree statu-

tory rape (see section 566.032), first-degree statutory sodomy (see section 566.062), and first-degree child molestation (see section 566.067).[1] Defendant's single, multifarious point relied on claims the trial court erred by: (1) overruling an objection to an officer's unspecified "testimony"; (2) admitting over Defendant's objection a video-recorded interview of Defendant; and (3) denying Defendant's request for a mistrial "in that it was improper for the [State to use] Defendant's request for an attorney as evidence against him because it created a prejudicial inference of guilt."[2] Finding no prejudicial error, we affirm.

## Standard of Review

■■■ The trial court has broad discretion in considering the admission of evidence, and its decision will not be disturbed absent a clear abuse of that discretion. *State v. Destefano*, 211 S.W.3d 173, 178 (Mo.App.S.D.2007). "A decision to admit evidence constitutes an abuse of discretion when the decision is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful consideration." *State v. Smith*, 330 S.W.3d 548, 553 (Mo.App.S.D. 2010). We review "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Forrest*, 183 S.W.3d 218, 223-24 (Mo. banc 2006) (quoting *State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999)). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 224.

## Factual and Procedural Background

Defendant does not challenge the sufficiency of the evidence to support his conviction. Viewed in the light most favorable to the verdict, the facts relevant to Defendant's claims are as follows.

In 2004, the victim ("Victim"), her mother ("Mother"), and Victim's two siblings moved in with Defendant. Mother and Defendant dated, but they were not married. Late one night, Victim was alone with Defendant, and they were giving each other back massages. Victim—who was about eleven years old at the time—was wearing a shirt, but she had removed her bra because it "was in the way[.]" Victim said

> [Defendant] told me to tell him if I became uncomfortable. At that point, he was rubbing my back, and he was slowly bringing his arms around to my breasts, and then go back up to my back. And, after each time, he asked me if I was uncomfortable. And I guess I was scared, because I kept telling him no. And, eventually, I told him, yes, yes, I'm uncomfortable and I pulled his hands away.

Defendant "looked scared[,]" so Victim went and sat on his lap. Defendant told Victim he could get into trouble, and Victim promised not to say anything about what had happened. Then, Defendant "laid [Victim] down on the floor" and penetrated her vagina with his finger. Defen-

1. All statutory references are to RSMo Cum. Supp.2006, unless otherwise indicated. All rule references are to Missouri Court Rules (2013).

2. "Points relied on containing multifarious claims violate Rule 84.04(d) and ordinarily are subject to dismissal." *Day v. State*, 208 S.W.3d 294, 295 (Mo.App.S.D.2006). However, because we can discern the nature of Defendant's claims, we exercise our discretion to review two of his complaints *ex gratia*. See *State v. Middlemist*, 319 S.W.3d 531, 534 n. 2 (Mo.App.S.D.2010).

dant continued this for "[a] couple of minutes."

Less than a week later, Defendant penetrated Victim's anus with his penis. Victim began crying, and she told Defendant to stop because it was painful. On another night, Victim was in Defendant's bed and felt Defendant's penis enter her vagina. Victim "flipped out" because she was concerned about getting pregnant. About a week later, Defendant and Victim had vaginal intercourse.

Mother entered the Army Reserves when Victim was twelve years old. While Mother was away, Defendant continued to have a sexual relationship with Victim, engaging in sexual intercourse with her sometimes multiple times per day. Victim observed on occasion that Defendant "would have trouble getting hard." Defendant informed Victim that he took erectile dysfunction medication, and he convinced Victim to experiment sexually to help him maintain an erection. On several occasions, Defendant inserted other objects, such as kitchen utensils, into Victim's vagina.

When Mother returned from the Army Reserves, Victim tried to conceal her sexual contact with Defendant from Mother. Victim continued to sleep in Defendant's bed, but she would set an alarm for 3:00 a.m. so she could go into her own bed before Mother returned home from her night job. On one occasion, Mother returned home from work early and saw Victim in bed with Defendant. Victim got out of Defendant's bed and had "a very guilty, I've been caught type [of] look, on her face[.]" Victim's sister was often "asked to go to bed" while Defendant and Victim stayed up together and watched movies. On one occasion, Victim's sister saw Victim in Defendant's bedroom around midnight.

In 2008, Victim disclosed her sexual relationship with Defendant to a counselor at a summer camp she was attending. The camp counselor explained that Victim's disclosure required her to inform the police about the matter. Victim begged the counselor not to do so, and she lied to cover up what she had disclosed. Based on the counselor's call to the police, Victim was interviewed and given a Sexual Assault Forensic Exam ("SAFE exam"), but the investigation into her disclosures was eventually closed.

In 2010, Victim was interviewed at her school regarding her relationship with Defendant. Victim again denied having any sexual contact with Defendant, but this time a SAFE exam administered to Victim showed "positive" results "consistent with sexual abuse[.]" In response to that finding, Defendant and Victim planned that Victim would tell the investigator that she had masturbated with a large object, which had caused the positive SAFE exam result. Victim then told both her pastor and her teacher about her sexual contact with Defendant. The following day, she also told Mother, and Victim was interviewed at a Child Advocacy Center ("CAC").

On March 23, 2010, Sergeant Warren Wiedemann interviewed Defendant for approximately four hours about Victim's allegations. Defendant denied engaging in sexual intercourse with Victim. The next day, Sergeant Wiedemann observed Victim's CAC interview. After watching that interview, Sergeant Wiedemann contacted Defendant again, and after advising him of his *Miranda*[3] rights, Defendant again agreed to talk with him. This time, Sergeant Wiedemann specifically referenced details that Victim had disclosed during

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

her CAC interview earlier that morning. Defendant did not "directly deny anything had happened." At the end of this second interview, the following exchange occurred:

[Sergeant Wiedemann]: But it was alright to talk about it yesterday, the first way to start healing is to tell the truth and to say you are sorry.

[Defendant]: I don't know at this time if I should continue talking or ask for an attorney.

[Sergeant Wiedemann]: That is your chose [sic]. I can't advise you on that either way. If you want an attorney tell me, if you want to continue talking tell me[;[4]] that is totally up to you. But after I talked with you yesterday, I wanted the chance to hear you say you were sorry cause I know what happened now. Let me ask you, do you want to continue talking or do you want an attorney, what do you want? That is your chose [sic]. I need your answer, what do you want to do[?]

. . . .

[Sergeant Wiedemann]: Well before I ask you any more questions, I have to stay with that same question, do you want to continue talking to me or do you want an attorney?

[Defendant]: There is so many things running through my mind right now.

[Sergeant Wiedemann]: Dave[,] answer one way or the other.

[Defendant]: I am not sure what would be best.

[Sergeant Wiedemann]: I can't advise you[;] that is not something I can do. Those are your rights, I respect those rights and that is completely up to you and that is a decision you need to make not me, but since you have men-

tioned it, I am going to wait until you decide before I ask you any questions[;] it is completely up to you.

[Defendant]: I am trying to think of the smartest thing versus the . . . I think the best thing would be to get an attorney.

[Sergeant Wiedemann]: That is fine[,] Dave, then our interview is over.

At trial, the State sought to admit the videotape of Sergeant Wiedemann's March 24, 2010 interview of Defendant. Prior to its admission, the State elicited the following testimony from Sergeant Wiedemann:

[State]: Now, at some point in the interview, toward the end, did [Defendant] begin to have a concern about whether he wanted to talk further?

[Sergeant Wiedemann]: Yes, he did.

[State]: And what was his stated reason that he was worried about?

[Sergeant Wiedemann]: He told me— well, right before that, he said that, the problem is that I love [Mother] so much. And I was trying to understand why that [sic]. And then he said, well, I'm not sure if I should continue talking to you or ask for an attorney.

Defendant objected that Sergeant Wiedemann's testimony constituted improper commentary on Defendant's invocation of his right to counsel. He also objected to the playing of the videotaped interview for the jury on the same ground. An edited version of the video, including the above-related exchange between Defendant and Sergeant Wiedemann, was played for the jury over Defendant's objection. The court also overruled the motion for a mistrial Defendant made after the video was played for the jury.[5]

---

4. Some punctuation has been added to enhance readability.

5. Because Defendant's brief is devoid of any argument demonstrating why the trial court

The jury found Defendant guilty of all three counts, and the court thereafter sentenced Defendant to serve concurrent, ten-year sentences on each count. This appeal timely followed.

### Analysis

Defendant's sole point on appeal asserts the trial court erred in admitting Sergeant Wiedemann's testimony and the videotaped interview because "it was improper for the [S]tate to use [Defendant]'s request for an attorney as evidence against him because it created a prejudicial inference of guilt."

■■■ The idea that post-*Miranda* silence may not be used for impeachment purposes is rooted in the privilege against self-incrimination afforded by the Fifth Amendment, as safeguarded by the *Miranda* warning.

> [W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the[se] warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). "It is well established that the State may not use a defendant's post-arrest silence, or language representing silence, to incriminate the defendant." *State v. Whitmore*, 948 S.W.2d 643, 647 (Mo.App.W.D.1997). "Silence" extends to a defendant's request for counsel. *Id.; see also Wainwright v. Greenfield*, 474 U.S. 284, 295 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). With

these precepts in mind, we turn to an analysis of Defendant's separate but related claims.

### *State's Exhibit 4: Defendant's Videotaped Interview*

■■■ Defendant argues the trial court erred in admitting into evidence the portions of the tape that showed Defendant invoking his right to counsel and his termination of the interview. To invoke the right to counsel, a defendant must make "an unambiguous, unequivocal and specific request for counsel." *State v. Harris*, 305 S.W.3d 482, 485 (Mo.App.E.D. 2010). Here, the parties do not dispute that Defendant's last statement on the tape—"I think the best thing would be to get an attorney"—constituted an unequivocal request for counsel. But his prior comments, such as "I don't know at this time if I should continue talking or ask for an attorney[,]" indicated that Defendant was at that point merely contemplating whether or not to request an attorney.

> [T]he rule against admissibility of an accused's post-arrest silence does not apply if he chooses to waive his Fifth Amendment right against self-incrimination by making statements while in custody. Once an accused agrees to answer questions, his failure to answer certain inquiries is a fair subject for comment at trial. Although an accused's waiver of his right against self-incrimination is not irrevocable, it is effective until withdrawn, and if an accused elects to reassert such right he must manifest that decision in some discernable way.

*State v. Pulis*, 822 S.W.2d 541, 546 (Mo. App.S.D.1992) (citations omitted). Be-

---

abused its discretion in denying his request for a mistrial, we deem that complaint abandoned. *State v. Khoshaba*, 878 S.W.2d 472, 475 (Mo.App.E.D.1994) ("Where appellant's

point is not developed in the argument portion of his brief, it is considered abandoned") (internal citations omitted).

cause they were made after waiving his *Miranda* rights and prior to Defendant's unequivocal request for counsel, the statements made by Defendant demonstrating only his "contemplation" of invoking his rights were admissible.

■ The conclusion of Defendant's interview was also properly admitted. While "any evidence concerning the termination of an interrogation which reveals that the defendant failed to answer a direct charge of guilt, or that the defendant 'clammed up' under circumstances calling imperatively for an admission or denial, is improper and should not be admitted[,]" *Whitmore*, 948 S.W.2d at 647, and "[a] request for an attorney may be perceived to be a remark which would be made by a guilty party[,]" *State v. Tims*, 865 S.W.2d 881, 886 (Mo.App.E.D.1993), the State is free to show the circumstances under which the interrogation was terminated as long as no inference of guilt can be reasonably drawn from the evidence. *State v. Ervin*, 398 S.W.3d 95, 101 (Mo.App.S.D. 2013); *State v. Frazier*, 927 S.W.2d 378, 380 (Mo.App.W.D.1996).

■ Here, the challenged evidence did not establish that Defendant had requested an attorney or had failed to provide an answer in the face of a direct charge of guilt. Directly prior to Defendant's unequivocal assertion of his right to counsel, Sergeant Wiedemann told Defendant:

> I can't advise you [about whether to request an attorney;] that is not something I can do. Those are your rights, I respect those rights and that is completely up to you and that is a decision you need to make not me, but since you have mentioned it, I am going to wait until you decide before I ask you any questions it is completely up to you.

Defendant's request for an attorney made immediately after these comments by Sergeant Wiedemann did not constitute an assertion by Defendant of his right to counsel in the face of a direct charge of guilt such that an inference of guilt could be reasonably drawn from his request. This portion of Defendant's point fails.

### Sergeant Wiedemann's Testimony

In the alternative, Defendant argues that Sergeant Wiedemann's testimony prior to the admission of the videotape was improper. Assuming, without deciding, that it was improper, we do not find that its admission constituted reversible error.

■ Testimony that a defendant revoked the waiver of his right to remain silent and requested an attorney must be "carefully scrutinized." *State v. Dexter*, 954 S.W.2d 332, 339 (Mo. banc 1997). As earlier noted, if an inference of guilt can be drawn from evidence describing the termination of an interview, such evidence should not be received. *Frazier*, 927 S.W.2d at 380. Here, the above-related exchange contained an arguably improper response by Sergeant Wiedemann. The State's question was: "Now, at some point in the interview, toward the end, did he begin to have a concern about whether he wanted to talk further?" The first portion of Sergeant Wiedemann's response—regarding Defendant's concern based on his professed love for Mother—was proper and did not implicate Defendant's right to remain silent. The final part, however, drew attention to the fact that Defendant had also expressed "concern" about continuing the interview without an attorney present. That portion of Sergeant Wiedemann's testimony served only to highlight for the jury the fact that Defendant had terminated the interview by requesting counsel.

■ Nevertheless, our review of the record convinces us that Defendant is not entitled to any relief because the error was

harmless beyond a reasonable doubt. "Once a *Doyle* violation has been found, this Court has discretion to review the violation or violations in the context of the entire record." *State v. Brooks*, 304 S.W.3d 130, 137 (Mo. banc 2010). "The proper standard of review, when the error is preserved, is the harmless-beyond-a-reasonable-doubt standard." *Id.* "Harmless beyond a reasonable doubt means that no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict." *Id.*

In making this determination, we consider "(1) whether the government made repeated *Doyle* violations, (2) whether any curative effort was made by the trial court, (3) whether the defendant's exculpatory evidence is transparently frivolous, and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming." *Dexter*, 954 S.W.2d at 340.

With respect to the first factor, we have determined that one isolated *Doyle* violation arguably occurred during Sergeant Wiedemann's testimony. The prosecutor made no reference to Defendant's request for an attorney during its presentation of evidence, and it made no such reference in either its opening statement or closing arguments. This is not a case in which repeated references to the defendant's silence were made and then emphasized again during closing argument. *See, e.g., Whitmore*, 948 S.W.2d at 648. Factor two favors Defendant as no curative effort was made by the trial court; it overruled both Defendant's objection to Sergeant Wiedemann's testimony and his subsequent request for a mistrial. In regard to the third factor, Defendant claimed that his interview responses to Sergeant Wiedemann were the result of a neurological disability caused by acute carbon monoxide poisoning. Defendant offered no evidence supporting that claim, and he offered no other exculpatory evidence.

Finally, and most importantly, Factor four weighs heavily against reversal. The evidence against Defendant was overwhelming. Victim offered extensive, detailed testimony about her frequent sexual contacts with Defendant over a period of years; Victim knew intimate details regarding Defendant's erectile dysfunction; Mother caught Victim in bed with Defendant in the wee hours of the morning; and the results of Victim's SAFE exam were consistent with sexual abuse. In light of this overwhelming evidence of Defendant's guilt, we find that any fleeting *Doyle* violation was harmless beyond a reasonable doubt.

Defendant's point is denied, and the judgment of conviction and sentence is affirmed.

JEFFREY W. BATES, and MARY W. SHEFFIELD, JJ., concur.