**STATE of Missouri, Respondent,**

v.

**Robert R. BROOKS, Appellant.**

No. SC 90347.

Supreme Court of Missouri,
En Banc.

Feb. 23, 2010.

Joseph F. Yeckel, Law Offices of Joseph F. Yeckel, LLC, St. Louis, Michael A.

Gross, Law Offices of Michael A. Gross, St. Louis, for appellant.

Chris Koster, Attorney General, Shaun J. Mackelprang, Assistant Attorney General, for respondent.

ZEL M. FISCHER, Judge.

## I. Introduction

In August 2007, a jury found Robert Brooks guilty of one count of second degree murder and one count of armed criminal action. He was sentenced to life imprisonment and 75 years to be served concurrently.

On appeal, Brooks alleges the trial court erred in allowing comments and testimony about Brooks' failure to provide an exculpatory statement to police after being advised of his *Miranda* rights. This Court determines that the trial court erred in allowing comments on Brooks' post–*Miranda* silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The judgment is reversed, and the case is remanded.

## II. Facts

In August 2006, Brooks was engaged to, and living with, Amanda Cates. Brooks and Cates lived in Crystal City with Brooks' 14–year-old daughter. Brooks and Cates were both police officers— Brooks worked for the village of Calverton Park and Cates worked for the city of Normandy.

On the evening of August 28, 2006, Brooks attended a city council meeting. One of the agenda items was whether a female part-time officer would be hired as a full-time officer. Brooks had trained the officer. The council decided not to hire the officer. Brooks was upset about this and, after the meeting, confronted the chief of police.

Brooks and the officer then went to a bar, arriving at approximately 9:30 p.m. While at the bar, Brooks consumed seven or eight beers. Brooks also received multiple calls from Cates, who was unhappy he was not home.

At approximately 11:00 p.m., Brooks ordered three beers to go, and drove the part-time officer home. On the way, Brooks attempted to convince her to get a hotel room with him. The officer declined Brooks' invitation, and he dropped her off at about 11:30 p.m. As the officer was exiting, Brooks kissed her and attempted to pull her back into the vehicle. Also, around this time, Brooks called a woman named "Michelle."

Brooks then headed home. On the way home Brooks and Cates exchanged multiple telephone calls. Cates continued to be upset that Brooks was not home. Brooks arrived home at about 12:13 a.m. and, on the way, had finished the three beers.

At trial, Brooks testified that when he walked into the bedroom he "tossed" his gun on the bed and attempted to get ready for bed. Cates, however, was still upset and continued to argue with Brooks. During the argument, Cates took Brooks' keys, went to his truck, took his cell phone, found that he had called "Michelle," threw the phone into the grass and then went back inside. Brooks testified that Cates attacked him and threw things at him. Brooks also testified that when he tried to leave, Cates pointed his gun at him. Brooks and Cates struggled, and during the struggle, the gun discharged, killing Cates.

Brooks then called 911 and told the dispatcher he thought Cates was an intruder and accidentally shot her. After police arrived, Brooks was overheard talking on the telephone with his mother, telling her that they were sleeping and that Cates got up and continued the argument and then

she was shot. Brooks was heard making similar statements to Officer Michael Tetrall.

At about 1:58 a.m., Brooks agreed to go to the Crystal City police station for an interview. Brooks was given the *Miranda* warning but refused to sign the department's *Miranda* form. Brooks was questioned, but repeatedly avoided answering. Brooks made the statements, "I don't have nothing to hide" and "I didn't do nothing at all." Brooks did not give an account of the struggle or shooting during the interview. After the interview concluded, Brooks was arrested.

The jury found Brooks guilty of second degree murder and armed criminal action and recommended sentences of life imprisonment and 75 years. The trial court sentenced Brooks in accordance with the jury's recommendation and ordered the sentences to run concurrently.

### III. At trial, the State commented and adduced testimony about Brooks' post–*Miranda* silence

Brooks alleges the trial court erred in allowing comments and testimony concerning Brooks' post–*Miranda* silence, which is prohibited under *Doyle*.

■ The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination is safeguarded by the mandatory procedures set out by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These procedures include the requirement that those in police custody be advised that they have the right to remain silent and that anything they may say can be used against them. *Id.* at 468–69, 86 S.Ct. 1602.

■ Breaching the implied assurances of the *Miranda* warning is an affront to the fundamental fairness required by the Due Process Clause. *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). In *Doyle*, based on that principle, the United States Supreme Court held that a defendant's post–*Miranda* silence cannot be used to impeach a defendant. 426 U.S. at 619, 96 S.Ct. 2240. The holding in *Doyle* rests on the view that it is fundamentally unfair to implicitly assure a person his silence will not be used against him and then breach that promise by using that silence against him. *Wainwright*, 474 U.S. at 291, 106 S.Ct. 634.

■ Relying on *Doyle's* notion of fundamental unfairness, Missouri's cases have held that post–*Miranda* silence cannot be used as evidence to incriminate a defendant. *See State v. Dexter*, 954 S.W.2d 332, 338 (Mo. banc 1997) (citing *State v. Zindel*, 918 S.W.2d 239 (Mo. banc 1996); *State v. Frazier*, 927 S.W.2d 378 (Mo.App.1996); *State v. Whitmore*, 948 S.W.2d 643 (Mo. App.1997); *State v. Martin*, 797 S.W.2d 758 (Mo.App.1990)). Moreover, post–*Miranda* silence cannot be used to impeach a defendant's testimony. *State v. Anderson*, 79 S.W.3d 420, 441 (Mo. banc 2002).

■ The State argues that Brooks waived all of his *Doyle* claims because he waived his silence when he told police that he had "nothing to hide" and "didn't do nothing at all." However, statements to police must be substantive to waive the right to silence. *Anderson v. Charles*, 447 U.S. 404, 408 n. 2, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (treating similar statements as not waiving the right to silence). A general denial of culpability, such as "I didn't do nothing at all," does not waive the right to remain silent. *State v. Crow*,

728 S.W.2d 229, 232 (Mo.App.1987) ("To waive his right to not have the State comment on the exercise of his right to silence, a defendant must make a statement obviously related to something, and then the waiver is only as to the subject matter of that statement").

Applying the foregoing principles to the facts of this case, it is clear that Brooks' Fifth Amendment right was violated and that he did not waive his *Doyle* claims. The multiple errors alleged by Brooks are as follows:

### A. Preserved Errors

■ The first *Doyle* violation occurred during opening statements when the State told the jury that, at the station, after Brooks received the *Miranda* warning, he failed to explain what happened:

> So Mr. Brooks goes to the station, he is not under arrest, not handcuffed, he goes down to the station and Lieutenant Thomas meets him down there, and they take him into the interview room and there is a camera being digitally recorded both on the video and also sound, and, you know, the defendant knows that. They also tell him to make sure he knows so there is no secrets there, even though he wasn't under arrest ... they went ahead and read him his Miranda warnings ... And basically all they did was ask him what happened, what happened, Bob. He never would tell them. Not a word. I need to talk to somebody is what he said, or I need a phone book. They gave him a phone book. Then he needs a phone number. They gave him a phone number. Then they say we want your side of the story, you are not under arrest, you are free to go, open the door and you are free to walk out of here. Over and over and over. You will see them ask him and he just tells—they didn't interrogate him like they do most people, they said just

tell us what happened. Not a word. Never told them that he thought she was an intruder and accidentally shot her. He never told them anything. That's going to last close to an hour or so. And then finally, you know, finally he says I am done. At that point he is pretty well a suspect at that point, so they place him under arrest. And I will have to cut it off at that point because he invokes his rights, so at that point I got to turn it off.

Brooks' objection was sustained, but his motion for a mistrial was overruled. The trial court instructed the jury to disregard the prosecuting attorney's comments regarding Brooks' exercise of his right to remain silent.

■ The second *Doyle* violation occurred when Lieutenant Terry Thomas testified that, during the interview at the police station, Brooks failed to explain his conduct:

> [Prosecuting Attorney]: ... [C]ould you just read the warnings that you gave him, please?
>
> [Lieutenant Thomas]: Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask any questions and have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.
>
> [Prosecuting Attorney]: All right. Now, did you handle this attempted interview a little different than you would say for just the common criminal on the street?
>
> [Lieutenant Thomas]: Yes.
>
> [Prosecuting Attorney]: All right. And how did you do it differently?

[Lieutenant Thomas]: We basically, I knew Mr. Brooks, and I say all we want is just a statement of what happened, we want to clarify everything, we want to give you the benefit of the doubt what exactly occurred.

[Prosecuting Attorney]: Did he, during the interview time period, ever tell you what happened?

[Lieutenant Thomas]: No, he did not.

[Prosecuting Attorney]: Did he ever give you an answer?

[Lieutenant Thomas]: No.

[Prosecuting Attorney]: Well besides yourself, who else was there for the interview[?] You and the defendant?

[Lieutenant Thomas]: Detective Mike Pruneau from the Crystal City Police Department.

[Prosecuting Attorney]: Do you know of any law enforcement officers who ever, while being questioned or not being questioned, he ever told what happened?

[Lieutenant Thomas]: No.

[Defense Counsel]: Your Honor, could we approach, please?

(At the bench)

[Defense Counsel]: Judge, I feel like we are revisiting this, but that question: "Do you know any officers that he ever told", that doesn't say prior to arrest. That could mean any time. And he did at some time assert his right, he, as Mr. Jerrell said in his opening statement, "he invoked his right, he called an attorney". This is now the third time, where there has been some comment, I believe this is directed as to whether or not he maintained his position on silence. Now, I let it go the first time, because according to Officer Thomas, at that time he wasn't under arrest. He had been Mirandized out of an abundance of caution, which is okay. And I believe that's he is only under—when he is no longer free to go. At this point he was still free to go. And I would like to be accurate, but I believe what was said, and I believe the court reporter would have it, was: "Are you aware of whether or not he made any statement at any point to any of the other officers".

[The Court]: That's what was said.

[Prosecuting Attorney]: Your Honor—

[Defense Counsel]: And that is a direct comment, because this jury can be led to believe that that happened even after he was placed under arrest, and there is no way to repair it now.

[Prosecuting Attorney]: I can certainly—I meant before, so I can certainly re-ask the question.

[The Court]: Well, I mean the objection will be sustained. I am going to instruct the jury—I am going to sustain the objection and instruct you to rephrase the question

[Prosecuting Attorney]: Sure. Certainly.

[Defense Counsel]: . . . And I would ask for a mistrial.

[The Court]: And the mistrial will be denied.

. . .

[The Court]: . . . I will sustain objection and instruct the prosecutor to re—rephrase the question.

. . .

[The Court]: The objection is sustained. The question is ordered stricken from the record. [Prosecuting Attorney], you are instructed to rephrase the question.

Brooks' objection was sustained, and his motion for a mistrial was overruled. The trial court instructed the prosecuting attorney to rephrase the question but erroneously did not instruct the jury to disregard the comment based on Brooks' right to remain silent.

**B. Unpreserved Errors**

■ Additionally, Brooks has identified *Doyle* violations that were not objected to at trial and, therefore, may be considered unpreserved for purposes of appeal or subject to plain error review.[1] During the State's opening argument, immediately after the trial court instructed the jury to ignore the State's comment about Brooks' post-*Miranda* silence, the State made another comment about Brooks' silence, "The evidence will show that for a good part of an hour, after repeatedly asking what happened, and he would not tell them."

The next comment about Brooks' post–*Miranda* silence came when a recording of the police interview was played for the jury. The recording contained multiple exchanges where Detective Pruneau told Brooks that he needed an explanation of what happened. The jury was already aware that Brooks never gave an explanation, and these questions were further comments about Brooks' post–*Miranda* silence. The recording contained the following comments:

> [Detective Pruneau]: Robert, I don't know what happened. All I want to do is find out what happened. And you know as well I do that when officers are first on the scene, they are coming in, they are getting their statements, you are giving a statement, we weren't

there, you are upset, things were going on, so you have been doing this for years.

. . .

> [Detective Pruneau]: . . . you know good and well that you can tell us what happened.

. . .

> [Detective Pruneau]: . . . here's the thing, Bob, and I keep saying this, I need, because I am—I am one of the investigators here, okay? And you know this. You have been there. You have don[e] it. You know how it goes. And you know—you know, whenever we talk to somebody and we hey listen, what is your side. And when we don't get cooperation—

. . .

> [Detective Pruneau]: . . . it's going to be hard for me to defend you, being a police officer and saying hey, you know what he didn't cooperate, and he didn't tell me this. You know that. So I need to hear from you what happened.

■ The tape of the interview was stopped shortly thereafter and without Brooks ever explaining what happened. As a result, the questions posed by Detective Pruneau were additional comments about Brooks' post–*Miranda* silence.[2]

1. Brooks also contends the State adduced testimony from Officers Wynn, Guidicy and McCreary about his post–*Miranda* silence. The officers' testimony did not refer to any post–*Miranda* period of time. Rather, a review of the transcript shows that the prosecutor was asking the officers about events and statements made by Brooks at the scene of the crime, before any *Miranda* warnings were given. Due process is not violated by the use of a defendant's pre–*Miranda* silence for impeachment purposes. *Jenkins v. Anderson,* 447 U.S. 231, 238–39, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).

2. The State suggests any error resulting from the recording was waived because defense

counsel stated "no objection" when the recording was offered into evidence. Rule 30.20 states, "Whether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." This Court always has the discretion to engage in plain error review of issues concerning substantial rights, especially constitutional rights such as the one at issue here. In this case, these unpreserved errors are considered in addition to the preserved errors for purposes of determining whether the State has met its burden to show that these constitutional violations were harmless beyond a reasonable doubt.

Brooks testified at trial. During cross-examination, the State commented about his post–*Miranda* silence, confirming that Brooks had, in fact, failed to give officers an account of what happened:

[Prosecuting Attorney]: ... you were here when the tape of that—or the CD of that interview was played to the jury, correct?

[Robert Brooks]: Yes, sir.

[Prosecuting Attorney]: All right. And neither Terry Thomas or Detective Mike Pruneau, basically what they asked you was, we just want to know what happened, give us your side of the story. Is that a fair rendition of what they were asking you?

[Robert Brooks]: I believe so.

[Prosecuting Attorney]: All right. And you never told them, did you?

[Robert Brooks]: Didn't say anything.

The State commented about Brooks' post–*Miranda* silence during closing arguments:

The only received defense evidence you have got is what he says happened, and quite frankly, no matter how embarrassed a person is, if it had really happened like he said, he would have been screaming it to the walls. He wouldn't have started out for the intruder lie. He wouldn't have kept the lie going. He would have changed it when asked.

### IV. *Doyle* analysis

■■■■ Once a *Doyle* violation has been found, this Court has discretion to review the violation or violations in the context of the entire record. *Dexter*, 954 S.W.2d at 340. The proper standard for review, when the error is preserved, is the harmless-beyond-a-reasonable-doubt standard. *Id.* at 340 n. 1. Under this standard, the State bears the burden of proving that a federal constitutional error was harmless beyond a reasonable doubt. *Id.* Harmless beyond a reasonable doubt means that no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict. *State v. March*, 216 S.W.3d 663, 667 (Mo. banc 2007).

■■■■ To determine the effect of a *Doyle* violation on the jury's verdict, this Court examines these factors: (1) whether the government made repeated *Doyle* violations; (2) whether the trial court made any curative effort; (3) whether the defendant's exculpatory evidence is transparently frivolous; and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming. *Dexter*, 954 S.W.2d at 340 n. 1.

### A. The State made repeated *Doyle* violations

There can be no doubt the State made repeated *Doyle* violations. Like *Dexter*, the State, whether purposefully or not, developed a theme that carried throughout all phases of trial. *Id.* at 340–41. As noted above, the theme was that if Brooks was innocent, he would have made an exculpatory statement during the police interview. This theme was repeated through all stages of trial.

### B. The trial court's curative efforts had little effect

The trial court undertook some action to cure the effect of each of the preserved errors. As noted, the State commented about Brooks' silence during opening arguments. The trial court told the jury to disregard the State's comment:

Ladies and gentlemen, the objection of defense counsel has been sustained. The jury will be instructed to disregard the prosecuting attorney's comments regarding the defendant's exercise of his right to remain silent. Those comments will be stricken from the record and

should play no part in your consideration of this case.

When Lieutenant Thomas commented about Brooks' right to remain silent, the trial court ordered the State to rephrase the question but erroneously did not instruct the jury to disregard the comment about Brooks' right to remain silent.

In *Dexter*, similar curative efforts were made to the jury. *Id.* at 341. This Court found those efforts to be minimal and determined that because the issue had been raised to the jury, it "created an inference of guilt by directing the jury to be suspicious of appellant's lack of response...." *Id.* The same is true concerning the facts of this case; the curative efforts here were minimal. Although the court instructed the jury to disregard the comment in the State's opening statement, it failed to give a similar instruction in response to Lieutenant Thomas' testimony. The court's efforts had little effect as the trial progressed because the jury had already entertained the State's suggestion that if Brooks was innocent he would have explained his struggle with Cates and his self-defense theory. Moreover, notwithstanding the trial court's rulings, the State continued to call attention to Brooks' post–*Miranda* silence.

## C. Brooks' exculpatory evidence is not transparently frivolous

Brooks' defense that he was struggling with Cates when the gun discharged was not transparently frivolous; in fact, the trial court gave the offered self-defense instruction, which is an implicit finding that the trial court believed there was substantial evidence to support the instruction. The defense was plausible and supported by Dr. Case's testimony that Cates was shot during a struggle over the gun. Brooks also testified about a prior occasion in which Cates had pointed a gun at him during an argument.

## D. Evidence of Brooks' guilt is not otherwise overwhelming

Evidence of Brooks' guilt is substantial but not overwhelming. In *Dexter*, this Court acknowledged the difficulty in determining what establishes "overwhelming evidence" but concluded that it means, "at a minimum that there is sufficient evidence to support a conviction without consideration of the inadmissible evidence ... [t]here must be no reasonable doubt that appellant committed the crime, and the degree of prejudice that occurred by use of the inadmissible references to appellant's post–*Miranda* warnings silence must be insubstantial." *Id.* at 342.

The State's use of Brooks' silence was not insubstantial. A review of the record suggests some of the more persuasive evidence of Brooks' guilt were the inconsistent pre–*Miranda* statements he made, but the State for the most part chose not to cross-examine him concerning those statements. In lieu of that permissible strategy, the State chose the impermissible strategy of using of Brooks' post–*Miranda* silence. The success of Brooks' self-defense instruction depended on his credibility, and the State's impermissible use of his post–*Miranda* silence undermined his credibility. Therefore, in light of the result in this case, it cannot be said that the cumulative effect of the multiple references to his post–*Miranda* silence were insubstantial.

## V. Conclusion

This Court determines that the State's repeated, improper references to Brooks' post–*Miranda* silence violated his constitutional rights as explained in *Doyle*. The State failed to meet its burden to show that the constitutional violations were harmless beyond a reasonable doubt. Because of: (1) the repeated *Doyle* viola-

tions; (2) the de minimus curative efforts; (3) the plausibility of Brooks' defense; and (4) the fact that the evidence of Brooks' guilt was not otherwise overwhelming, the judgment is reversed, and the cause is remanded.

All concur.