

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI,

                         **Respondent,**

v.

MICHAEL L. ELLMAKER,

                         **Appellant.**

**WD83026**

**OPINION FILED:**

**October 20, 2020**

**Appeal from the Circuit Court of Platte County, Missouri**
**The Honorable James Walter Van Amburg, Judge**

**Before Division Three:**
**Gary D. Witt, P.J., Lisa White Hardwick and Thomas N. Chapman, JJ.**

Michael Ellmaker ("Ellmaker") was convicted of driving while intoxicated ("DWI") following a jury trial in the Circuit Court of Platte County. The trial court found that Ellmaker was a habitual offender due to his six prior intoxication-related traffic offenses, entered a conviction for the class B felony of driving while intoxicated, and sentenced Ellmaker accordingly. Ellmaker appeals. In his first point, he argues that the trial court erred in finding that he was a habitual offender because the evidence produced by the State was insufficient to prove that two of his prior convictions qualify as intoxication-related traffic offenses. In his second point, he argues that the court erred in permitting testimony that referred to Ellmaker's post-arrest silence. In his third point, he contends that the trial court plainly erred in failing to

intervene when the State impermissibly referred to Ellmaker's post-arrest silence in opening statement and closing argument. We have determined that the trial court erred in permitting testimony regarding Ellmaker's post-arrest silence as substantive evidence of guilt. The judgment is reversed, and the case is remanded.

**Factual and Procedural History**

On April 8, 2017, Sergeant Campbell ("Campbell") received a broadcast about a possible intoxicated driver leaving the Argosy Casino in a silver four-door car. Campbell spotted a silver Buick Lucerne with expired license plates, and began following the vehicle. He noticed the vehicle crossed the double solid lines as it went around a curve. As the vehicle stopped at a red light, Campbell saw the driver of the vehicle take a drink from a can inside a blue koozie. When the light turned green, Campbell stopped the vehicle, which was driven by Ellmaker. When asked for his license, registration, and insurance, Ellmaker was not able to provide these documents, and instead offered a cell phone bill. At this time, Ellmaker asked if his passenger could drive. Campbell noticed that Ellmaker's eyes were watery and bloodshot, and could smell alcohol when Ellmaker spoke. Ellmaker indicated that he had not been drinking and that the can in the car was a Coke. However, the passenger volunteered that the can (later confirmed to be a Busch beer can) was the passenger's beer.

Campbell testified that Ellmaker "kind of staggered" while exiting his car and maintained contact with the trunk of the vehicle as he stood. When asked, Ellmaker agreed to take a field sobriety test, but mentioned that "he had a bad knee."

Sergeant Campbell testified that there are three standardized field sobriety tests: the horizontal gaze nystagmus (HGN), the walk and turn, and the one-legged stand. Due to his purported physical disability, Ellmaker was not asked to perform the walk and turn or one-legged

2

stand tests, but was asked to perform the HGN field sobriety test. The HGN is an eye test that checks for six indicators of impairment. Sergeant Campbell testified that four positive indicators suggest impairment, and that six of six clues indicate a "high level of BAC, blood alcohol content." Ellmaker showed all six clues, which led Campbell to conclude that Ellmaker was impaired.[1]

Sergeant Campbell placed Ellmaker under arrest. When he was told that he was being placed under arrest subject to the administration of a breathalyzer, Ellmaker stated that he had just come from the casino and had "had a few." At the Riverside Police Station, Campbell administered a breathalyzer test. The test used allows the taker six attempts to provide a sufficient sample of air. If a sufficient sample is not provided in six attempts, then the machine times out, and it is treated as a refusal. Ellmaker did not provide a sufficient amount of air in his six attempts, and was thus considered to have refused to take the breathalyzer test.

After providing Ellmaker his *Miranda* warnings, Sergeant Campbell asked Ellmaker a number of questions. Mr. Ellmaker said that he was gambling at the Ameristar Casino. Ellmaker said that he started drinking at five o'clock and stopped drinking ten minutes after six o'clock (an hour and ten minutes). However, Ellmaker also indicated that he was drinking at a pace of one beer an hour, and that he drank three beers (which suggested he had been drinking for three hours). When asked whether he was under the influence when he was stopped, Ellmaker said that he did not want to answer that question.

---

[1] Sergeant Campbell also testified that, in addition to the field sobriety tests, there were other things that he looked for to determine whether Ellmaker was intoxicated. This included whether he could follow the instructions of a "divided attention task" – to put his feet together and his hands to his side. Ellmaker did successfully follow said instructions. Campbell also acknowledged that he did not report that Ellmaker's speech was slurred or that he used profanity; and did not find that he was confused or that he spoke incoherently.

Ellmaker was charged in Platte County Circuit Court with the class B felony of driving while intoxicated as a habitual offender. He was also charged with the misdemeanor[2] of failure to drive on the right half of the roadway. After a jury trial, Ellmaker was convicted on the DWI offense. He was sentenced to ten years of imprisonment. He appeals to this court.

## Point One

In his first point on appeal, Ellmaker contends that the trial court erred in finding him to be a habitual DWI offender, because there was insufficient evidence to prove that two of his six prior convictions qualified as intoxication-related traffic offenses ("IRTOs").

Driving while intoxicated is a class B felony if the defendant is a habitual offender, whereas the offense is a class C felony if the defendant is a chronic offender. § 577.010.[3] A "habitual offender" is a person found guilty of five or more IRTOs committed on separate occasions, while a "chronic offender" is a person who has been found guilty of four or more such IRTOs. § 577.001(5), (11). Section 577.023.4 provides in relevant part:

> Evidence offered as proof of the defendant's status as a . . . habitual offender . . . shall include but not be limited to evidence of findings of guilt received by a search of the records of the Missouri uniform law enforcement system, including criminal history records from the central repository or records from the driving while intoxicated tracking system (DWITS) maintained by the Missouri state highway patrol, or the certified driving record maintained by the Missouri department of revenue.

The State has the burden to prove prior IRTOs beyond a reasonable doubt. *State v. Craig*, 287 S.W.3d 676, 681 (Mo. banc 2009). "The standard of review for this court-tried issue is the same as in a jury-tried case." *State v. Cordell*, 500 S.W.3d 343, 345 (Mo. App. S.D. 2016).

---

[2] A mistrial was declared on the misdemeanor offense after the jury was deadlocked on that count, and the State dismissed that charge following the trial.

[3] Because the relevant time for determining whether a previous offense constitutes an IRTO is the date of the current offense (April 8, 2017), all statutory references are to RSMo 2016, unless otherwise noted.

Under section 577.023, the State need only present sufficient facts to support a finding beyond a reasonable doubt that the defendant either pled guilty or was found guilty of the requisite number of prior IRTOs. *State v. Coday*, 496 S.W.3d 572, 574 (Mo. App. W.D. 2016). In making this determination, "we accept as true all evidence to prove the prior offenses together with all reasonable inferences that support the circuit court's finding." *State v. Rigsby*, 589 S.W.3d 661, 664 (Mo. App. W.D. 2019) (quoting *Coday*, 496 S.W.3d at 574).

In this matter, the State presented evidence seeking to show that Ellmaker had six prior IRTOs. State's Exhibit 1, which was comprised of records showing a 2006 Jackson County conviction for C felony (aggravated offender) DWI, was admitted without objection. Following its admission, the trial court asked if there was any argument regarding State's Exhibit 1. Ellmaker's counsel then indicated what ended up being the entire extent of his argument at trial regarding the admission of his prior convictions:

> So I do have a - I don't have a general objection. In *State v. O'Coday* [sic], which is 496 S.W.3d 572, to the extent that that felony conviction is insufficient to support a conviction of DWI or DUI in the State of Missouri under the laws at that time, we would be objecting, but nothing further.[4]

The State then offered State's Exhibit 2, which included the DWITS records from the Highway Patrol, and also offered State's Exhibit 3, which included Ellmaker's driving record maintained by the Missouri Department of Revenue ("DOR"). In response to State's Exhibits 2 and 3 (which included all six of Ellmaker's prior convictions for driving while intoxicated), Ellmaker's counsel indicated, "No objection, well other than the same objection to the last, the *State v. Coday*, just the general objection." Ellmaker did not state which of the six convictions he was

---

[4] *State v. Coday,* 496 S.W.3d 572 (Mo. App. W.D. 2016).

5

challenging or make any specific argument as to how or why any of the convictions would be impacted by the holding in *Coday*.

On appeal, Ellmaker challenges the sufficiency of the State's evidence in support of the court's determination that Ellmaker was a habitual offender pursuant to Section 577.001(11). He argues that the February 18, 1993[5] and December 21, 1993[6] convictions in the Circuit Court of Jackson County, Missouri for driving while intoxicated under section 577.010 were insufficient because they did not constitute IRTOs.[7] Regarding both of the challenged 1993 convictions, the DWITS records maintained by the highway patrol indicated (under the charge code description), "DWI/ALCOHOL." Ellmaker's DOR driving record indicates that he was convicted of "DRIVING WHILE INTOXICATED" in both of the challenged 1993 IRTOs.

"In determining whether a previous offense qualifies as an IRTO it must involve conduct sought to be deterred at the time of the present offense." *Cordell*, 500 S.W.3d at 345. At the time of Ellmaker's present (2017) offense, driving while intoxicated fell within the definition of an "intoxication-related traffic offense." § 577.001(15). "A person commit[ted] the offense of driving while intoxicated if he or she operate[d] a vehicle while in an intoxicated condition." § 577.010.1. "'Drive', 'driving', 'operates', or 'operating', mean[t] physically driving or operating a vehicle or vessel[.]" § 577.001(9). However, at the time of Ellmaker's two contested 1993 convictions, the terms "'drive', 'driving', 'operates' or 'operating' mean[t] physically driving or

---

[5] For events occurring on May 30, 1992.
[6] For events occurring on January 1, 1993.
[7] Ellmaker does not challenge that the other four convictions constitute IRTOs. They are as follows: (1) a July 27, 2006 conviction for driving while intoxicated (for events occurring on October 8, 2005, as set forth in the Jackson County Circuit Court records included in State's Exhibit 1); (2) a December 21, 1993 conviction for driving while intoxicated (for events occurring on April 6, 1993); (3) a January 18, 1989 conviction for driving while intoxicated (for events occurring on November 21, 1988); and (4) a November 13, 1985 conviction for driving while intoxicated (for events occurring on August 16, 1985).

6

operating *or being in actual physical control* of a motor vehicle." § 577.001.1 RSMo (1994) (emphasis added). Due to the removal of the phrase "or being in actual physical control" from the statute, Ellmaker contends that two of his convictions from 1993 may have involved only being in physical control of the vehicle rather than physically driving or operating the vehicle as "driving" and "operating" were defined at the time of his present offense. The issue presented by Ellmaker is whether the evidence presented by the State showing that he had two 1993 convictions for "DRIVING WHILE INTOXICATED" is sufficient evidence to support a finding beyond a reasonable doubt that the conduct giving rise to those convictions was for driving or operating a motor vehicle while intoxicated, given that he might have been convicted for conduct (being in physical control rather than physically driving or operating) that would not constitute an IRTO at the time of his present (2017) offense.[8]

In *State v. Gibson*, it was not disputed that the prior offense that was considered for enhancement purposes involved "physical control of a motor vehicle while under the influence of alcohol" and did not include actual operation of the vehicle. 122 S.W.3d 121, 130 (Mo. App. W.D. 2003). In *Gibson*, our court determined that, because the past offense for which the appellant was convicted would not constitute an IRTO at the time of the offense being appealed, the prior offense did not qualify as an IRTO for enhancement purposes. *Id.* However, Ellmaker's case is distinct from *Gibson* in that Ellmaker's contested convictions are labeled as

---

[8] We note that Ellmaker failed to direct the trial court to which prior convictions he was challenging or provide any argument as to how *State v. Coday* was applicable or relevant to any of the six prior convictions contained within the exhibits. On appeal, he argues that the trial court should have known the status of the relevant Missouri statutes which were in effect over 25 years before and should have determined on its own that the two 1993 convictions did not constitute valid IRTOs under the current law. For the trial court to have undertaken such an exercise would have put it in the position of becoming an advocate for a party, which it cannot do. *State v. Deweese,* 540 S.W.3d 490, 494 (Mo. App. W.D. 2018).

7

convictions for "DRIVING WHILE INTOXICATED" in the DOR driving records, and said records do not identify the specific conduct (physical control, rather than driving or operating) that would no longer constitute "driving" or "operating" for purposes of an IRTO. Thus, unlike the appellant in *Gibson*, Ellmaker does not argue that his convictions were for conduct that no longer constituted an IRTO; he argues that they *might have been* for such conduct, and that the State's evidence thus fails to establish beyond a reasonable doubt that Ellmaker's conduct did qualify as an IRTO.

Missouri courts have held that when "the legislature lists a particular source as authorizing the trial court to find the existence of a prior conviction, that source contains all the information necessary to prove the prior conviction." *State v. Rattles*, 450 S.W.3d 470, 474 (Mo. App. S.D. 2014); *State v. Miller*, 153 S.W.3d 333, 338 (Mo. App. S.D. 2005) ("In our view, section 577.023.14[9] demonstrates clear legislative intent to establish the minimum evidentiary burden which must be met by the State in order to make a *prima facie* showing that a prior conviction qualifies as a predicate offense for purposes of enhanced punishment.").

The State contends that, at minimum, the State's evidence (the DWITS and DOR records indicating that Ellmaker was "driving" while intoxicated) established a *prima facie* case that Ellmaker had a sufficient number of priors, and therefore, it was incumbent on Ellmaker to introduce evidence that the convictions did not occur or were for conduct that no longer constitutes an IRTO. *See State v. Thomas*, 969 S.W.2d 354, 357 (Mo. App. W.D. 1998) ("The Department of Revenue records, therefore, explicitly established that Mr. Thomas was twice convicted of driving while intoxicated. If the Department of Revenue records were erroneous, it

---

[9] This subsection is currently located at 577.023.4, but the relevant language remains unchanged.

was incumbent on Mr. Thomas to introduce evidence establishing that no such convictions occurred.").[10]

*State v. Cordell* involved a nearly identical argument and evidentiary basis as presented in this matter. 500 S.W.3d at 345. In *Cordell*, the defendant argued that a DOR-certified driving record, which indicated municipal convictions for "DRIVING WHILE INTOXICATED," was insufficient because it did not

> exclude the possibilities that, (1) in addition to criminalizing *driving* or *operating* a motor vehicle while in an intoxicated condition, the driving-while-intoxicated ordinance underlying either or both municipal convictions at that time might have criminalized other conduct, such as being in *actual physical control* of a vehicle while intoxicated, and (2) it was for this other conduct that she was convicted.

*Id.* at 346. The court rejected the defendant's argument, noting that it miscomprehended "the nature of the State's burden of proof and the use of circumstantial evidence to satisfy that burden." *Id.*

The *Cordell* court noted that the evidence before the trial court showed via DOR records that the defendant had three prior convictions for "DRIVING WHILE INTOXICATED." *Id.* at 347. This circumstantial evidence, according to *Cordell*, supported the inference that the conduct underlying these convictions comported with physically driving a motor vehicle in an intoxicated condition, and thereby met the definition of an IRTO. *Id.* Because drawing this inference was reasonable, the court held that the trial court did not err in inferring that a

---

[10] In *Thomas*, the defendant did not dispute the fact of his prior driving while intoxicated convictions or argue that they may have been based on conduct that no longer qualifies as an IRTO; rather, he argued the admissibility and sufficiency of DOR records. *Thomas*, 969 S.W.2d at 355. The events in *Thomas* occurred in 1995, prior to the 1996 amendment that removed the "actual physical control" language from the definition of driving. Additionally, Department of Revenue records were not, at the time, expressly statutorily authorized as evidence of prior convictions for persistent offender status.

conviction for "DRIVING WHILE INTOXICATED" was indeed a conviction for *driving* while intoxicated. *Id.*

As in *Cordell*, we find that the State made a *prima facie* showing that Ellmaker's prior convictions qualified as IRTOs. "Prima facie evidence, if not refuted, constitutes proof beyond a reasonable doubt." *State v. Johnson*, 160 S.W.3d 839, 843 (Mo. App. S.D. 2005) (quoting *Wright-El v. State*, 760 S.W.2d 488, 490 (Mo. App. E.D. 1988)). Although the State's evidence does not entirely exclude the possibility that Ellmaker may have been convicted for conduct that no longer qualifies as an IRTO, "we cannot say here that it was unreasonable for the trial court to infer that [Ellmaker's past] conviction[s] for 'driving while intoxicated' [were] conviction[s] for *driving* while intoxicated." *Cordell*, 500 S.W.3d at 347. Once the state made its *prima facie* showing, Ellmaker was capable of making appropriate arguments and/or introducing evidence to rebut the reasonable inference that the convictions constituted valid IRTOs under the statute. However, absent such a showing by Ellmaker, we cannot say that the trial court's inference was unreasonable.[11]

Point one is denied.

---

[11] Ellmaker's reliance on *State v. Coday*, 496 S.W.3d 572 (Mo. App. W.D. 2016), is misplaced. In *State v. Coday*, the appellant had two prior convictions for "driving under influence of alcohol and/or drugs" in violation of Kansas law. *Id.* at 575. The relevant statute in Kansas defining the offense included language that no person "shall operate or attempt to operate any vehicle[.]" *Id.* The State provided evidence from traffic appearance dockets which indicated that the appellant had pled guilty to two offenses of "driving while under influence of alcohol and/or drugs." *Id.* at 575-76. In *Coday*, our court concluded that convictions for "attempting to operate" did not constitute IRTOs for purposes of section 577.023, and, therefore, the State did not establish beyond a reasonable doubt that Coday did in fact operate a vehicle while under the influence of alcohol and drugs. *Id.* at 576. However, *Coday* can be distinguished. Unlike the circumstances in *State v. Cordell*, or in this matter, in *State v Coday* the State relied on traffic court records from the State of Kansas, and did not rely upon records (such as DWITS or DOR records) statutorily recognized under section 577.023.4 to establish IRTOs – records that contain "all the information necessary to prove the prior conviction." *See Rattles*, 450 S.W.3d at 474; *see also Miller*, 153 S.W.3d at 338 ("In our view, section 577.023.[4] demonstrates clear legislative intent to establish the minimum evidentiary burden which must be met by the State in order to make a *prima facie* showing that a prior conviction qualifies as a predicate offense for purposes of enhanced punishment.").

**Points Two and Three**

In his second point on appeal, Ellmaker contends that the trial court erred in admitting testimony that impermissibly commented on Ellmaker's post-arrest silence under circumstances that called imperatively for an admission or denial of guilt. In his third point, he contends that the trial court plainly erred in failing to intervene when the State argued to the jury that Ellmaker's reclamation of his right to silence was evidence of Ellmaker's guilt. We address these points together.

The Fifth Amendment[12] provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The privilege against self-incrimination requires that "those taken into police custody be informed that they have the right to remain silent, that anything they say can be used against them and that they have the right to counsel before submitting to interrogation." *State v. Dexter*, 954 S.W.2d 332, 337 (Mo. banc 1997) (citing *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966)).

In *Doyle v. Ohio*, the United States Supreme Court held that it violates the defendant's due process rights to allow a defendant's post-arrest, post-*Miranda* silence[13] to be used to impeach the defendant at trial. 426 U.S. 610, 618 (1976). This rule is premised on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Dexter*, 954 S.W.2d at 337 (quoting *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986)). *See also State v. Brooks*, 304 S.W.3d 130, 133 (Mo. banc 2010) ("Breaching the implied assurances of the

---

[12] The Fifth Amendment privilege against self-incrimination applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

[13] In the context of post-*Miranda* warnings silence, "silence does not mean only muteness; it includes the statement of a desire to remain silent[.]" *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986).

11

*Miranda* warning is an affront to the fundamental fairness required by the Due Process Clause."). Relying on the notion of fundamental unfairness in *Doyle*, "Missouri's cases have held that post-*Miranda* silence cannot be used as evidence to incriminate a defendant." *Brooks*, 304 S.W.3d at 133 ("Moreover, post-*Miranda* silence cannot be used to impeach a defendant's testimony.").

Although "we review the trial court's decision to admit evidence for abuse of discretion, whether a defendant's constitutional rights were violated is a question of law reviewed *de novo*." *State v. Williams*, 366 S.W.3d 609, 615 (Mo. App. W.D. 2012) (internal quotations omitted). If a *Doyle* violation is found, courts have "discretion to review the violation or violations in the context of the entire record." *Brooks*, 304 S.W.3d at 137. When the error is preserved, it is reviewed to determine whether it is harmless beyond a reasonable doubt. *Id.* The State has the burden of demonstrating that "no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict." *State v. Rice*, 573 S.W.3d 53, 72 (Mo. banc 2019) (quoting *Brooks*, 304 S.W.3d at 137). In determining the effect of a *Doyle* violation on the jury's verdict, we examine four factors:[14] "(1) whether the government made repeated *Doyle* violations; (2) whether the trial court made any curative effort; (3) whether the defendant's exculpatory evidence is transparently frivolous; and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming." *Brooks*, 304 S.W.3d at 137.

---

[14] The four factors used to evaluate the effect of a *Doyle* violation on a jury verdict are the same for preserved and unpreserved error. *State v. Dexter*, 954 S.W.2d 332, 340 n.1 (Mo. banc 1997). As discussed below, Ellmaker acknowledges that the errors alleged in his third point are not properly preserved. However, the effect of unpreserved *Doyle* violations factors into our analysis of whether the government made repeated *Doyle* violations. Accordingly, the errors alleged in Ellmaker's third point will be considered in evaluating the effect on the jury of the *Doyle* violation alleged in Ellmaker's properly preserved second point. *See Brooks*, 304 S.W.3d at 136 n.2 ("In this case, these unpreserved errors are considered in addition to the preserved errors for purposes of determining whether the State has met its burden to show that these constitutional violations were harmless beyond a reasonable doubt."). Because our disposition of Point Two resolves the appeal and because the repeated (but unpreserved) *Doyle* violations claimed in Point Three are among the factors considered in determining the effect (prejudice) resulting from the preserved Doyle violation addressed in Point Two, we do not separately address Ellmaker's third point.

The State contends that Ellmaker's second point is not properly preserved, because Ellmaker raised different grounds in his motion for new trial than he did on appeal. *See State v. Starks*, 470 S.W.3d 410, 413 (Mo. App. E.D. 2015) ("To preserve an allegation of error for appellate review, an objection stating the grounds must be made at trial, that same objection must be set out in the motion for new trial, and the objection must be carried forward in the appellate brief."). We find that Ellmaker's second point is properly preserved, because the right against self-incrimination as well as the relevant constitutional provisions were raised by objection at trial, in Ellmaker's motion for new trial, and in his appellate brief.

In his properly preserved second point, Ellmaker claims a *Doyle* violation occurred during the State's direct examination of Sergeant Campbell when the following exchange occurred:

> [The State]: And did you ask this defendant that final question, if he was under the influence when he was stopped?
>
> [Campbell]: Yes.
>
> [The State]: Was the defendant willing to give you an answer?
>
> [Defense Counsel]: Your Honor, may we approach?

At this point, defense counsel objected on the grounds that he believed the witness was going to make a statement as to Ellmaker's silence about a particular question, which, if allowed, would violate his right against self-incrimination. The objection was overruled, and the following exchange occurred:

> [The State]: How did the defendant answer when you asked him if he was under the influence?
>
> [Campbell]: He said he did not want to answer that question.

13

[The State]: Did the defendant refuse to answer any other of your questions that day?

[Campbell]: No.

[The State]: Nothing further of this witness, Your Honor.

In his third point, Ellmaker alleges that further *Doyle* violations occurred when the State referred to Ellmaker's refusal to answer during opening statement and closing argument. Ellmaker acknowledges that his third point is not properly preserved, due to the lack of an objection during the State's comments during opening statement and closing argument. However, we have "discretion to engage in plain error review of issues concerning substantial rights, especially constitutional rights such as the one at issue here." *Brooks*, 304 S.W.3d at 136 n.2. As previously discussed, when a properly preserved *Doyle* violation is reviewed under the harmless beyond a reasonable doubt standard, whether the government made repeated *Doyle* violations is necessarily part of the analysis. *See id.* at 137.

During opening statement, the State said to the jury:

> The defendant provided answers to most of Sergeant Campbell's questions. He admitted to drinking. He said he had three beers, roughly one every hour starting at five p.m. at the Ameristar Casino. The only question the defendant refused to answer was whether he was under the influence when he was stopped.

During closing argument, the State twice referred to Ellmaker's refusal to answer the question as evidence of a guilty conscience. In the first instance, the State argued that the "defendant had a guilty conscience as evidenced" when "[h]e refused to answer Sergeant Campbell's question whether he was under the influence[.]" Later, the State argued to the jury:

> But we have another case where the defendant's guilty conscience shows itself. And that's when Sergeant Campbell interviews the defendant back at the Riverside Police Department. Defendant answers the majority of Sergeant Campbell's questions but there is one question that he refuses to answer and that is whether he

14

was under the influence at the time of the stop.  Why didn't he answer that question?  Because he knew he was and he didn't want to tell Sergeant Campbell the truth.

The State argues that no *Doyle* violation occurred, because Ellmaker waived the right to silence and never effectively revoked his waiver.  Therefore, according to the State, it was proper to use his express refusal to answer as substantive evidence of his guilt.  The State argues further that the reassertion of the right is "not available to avoid a single offensive question[.]" *State v. Ervin*, 398 S.W.3d 95, 100 (Mo. App. S.D. 2013) (quoting *State v. Smart*, 756 S.W.2d 578, 581 (Mo. App. W.D. 1988)).

Ellmaker contends that he effectively reclaimed his right to silence when he responded that he did not want to answer Sergeant Campbell's question, which called imperatively for an admission or denial of whether he was under the influence at the time of the stop.  He contends further that it would be fundamentally unfair to implicitly assure him that his silence would not be used against him only to use his exercise of his Fifth Amendment privilege as evidence of his guilt.

A defendant may waive his right to remain silent by making substantive statements to police.  *Brooks*, 304 S.W.3d at 133; *see also State v. Crow*, 728 S.W.2d 229, 232 (Mo. App. E.D. 1987) ("To waive his right to not have the State comment on the exercise of his right to silence, a defendant must make a statement obviously related to something, and then the waiver is only as to the subject matter of that statement.").  After a defendant "waives his right to remain silent, all speech or non-silence, by a defendant may be admitted into evidence and remarked on." *State v. Frazier*, 927 S.W.2d 378, 379-80 (Mo. App. W.D. 1996).  This waiver can be revoked at any time, "at which point his silence is again protected." *Id.* at 380.  As described in detail in *Frazier*:

15

> Once the defendant revokes the waiver of his right to remain silent, the state can show the circumstances under which an interrogation was terminated. Nonetheless, any evidence describing the conclusion of an interrogation must be carefully scrutinized. Evidence in regard to the conclusion of an interrogation which reveals that the defendant was failing to answer a direct charge of guilt is improper. Likewise, evidence which reflects that the defendant "clammed up" under circumstances calling imperatively for an admission or denial should not be admitted. However, to the extent that no inference of guilt can reasonably be drawn from evidence describing the conclusion of an interrogation, it is admissible.

*Id.* (internal citations omitted).

In the case at bar, Ellmaker initially waived his right to silence by answering a number of Sergeant Campbell's questions. Thus, the State was allowed to comment on the subject matter of the statements that Ellmaker did make. The issues that need to be resolved are whether Ellmaker effectively revoked the waiver of his right to silence and whether the State violated his rights by using his refusal to answer as substantive evidence of his guilt.[15]

After receiving *Miranda* warnings, if an individual "indicates in any manner, *at any time prior to or during the questioning*, that he wishes to remain silent, the interrogation must cease." *State v. Rice*, 573 S.W.3d 53, 67 (Mo. banc 2019) (quoting *Miranda v. Arizona*, 384 U.S. at 473-74) (emphasis added by Missouri Supreme Court). "[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *Rice*, 573 S.W.3d at 67 (quoting *Emspak v. United States*, 349 U.S. 190, 194 (1955)). But, to invoke this right, the individual "must give a clear, consistent expression of a desire to remain silent." *Rice*, 573 S.W.3d at 67 (internal quotations omitted).

---

[15] We note that this case does not involve the use of post-arrest silence for impeachment purposes; rather, it involves the use of such silence as substantive evidence of guilt in the State's case-in-chief. Using post-arrest silence as substantive evidence of guilt is different from and more serious than the use of post-arrest silence for impeachment purposes. *See State v. Graves*, 27 S.W.3d 806, 811 (Mo. App. W.D. 2000) ("[W]e consider such a use of all post-arrest silence, both before and after *Miranda* warnings are issued, repugnant to the Fifth Amendment privilege against self-incrimination.").

16

Ellmaker reclaimed his right to silence by expressly refusing to answer Sergeant Campbell's question.[16] In refusing to answer the question, he indicated a clear desire to remain silent; and, significantly, the interrogation was then terminated. As this express refusal concluded the interrogation, Ellmaker maintained a clear and consistent position as to his desire to then remain silent. He never wavered from this position thereafter; and he did not provide any further statements.

The circumstances under which Ellmaker asserted his right to remain silent are the same as those described in *Frazier*. 927 S.W.2d at 380. Sergeant Campbell's testimony "reflect[ed] that the defendant 'clammed up' under circumstances calling imperatively for an admission or denial" of whether Ellmaker was driving under the influence. *Id.* Because a direct inference of guilt can be drawn from Ellmaker's refusal to answer the question, (an inference the State asked the jury to draw in its closing argument), a *Doyle* violation occurred when Sergeant Campbell was allowed to testify at trial regarding Ellmaker's assertion of his right to remain silent.

The case at bar is distinct from *State v. Ervin*, upon which the State principally relies. In *Ervin*, a defendant was interrogated and initially answered the detective's questions. 398 S.W.3d at 99. When the defendant was asked if he knew how the victim was injured, he did not respond; when asked again, he responded, "That's what this whole thing is about?" *Id.* After the detective explained the goal was to figure out how the victim was injured, the defendant said that he did not want to talk anymore, at which point the interview ended. *Id.* The *Ervin* court determined that the portion of the video that showed the defendant's silence before asking a

---

[16] It is not clear from the record precisely what Mr. Ellmaker said in refusing to answer. Sergeant Campbell testified that Mr. Ellmaker "said he did not want to answer that question." This was in response to being asked the "final question" of whether he was under the influence when he was stopped.

17

question was admissible because the defendant had not yet affirmatively invoked his right to silence. *Id.* at 100. As to when the defendant did affirmatively assert his rights, the *Ervin* court made clear "that such evidence cannot be used to incriminate a defendant." *Id.* However, because the *Ervin* court found that the evidence did not create an impermissible inference of guilt, the evidence was held to be admissible. *Id.* at 101 ("This is not a case where the defendant refused to answer a direct charge of guilt or 'clammed up' under circumstances calling for an admission or denial."). The *Ervin* court also found significant that the State never drew attention to the assertion of the Fifth Amendment privilege during opening statement, testimony, or closing argument. *Id.*[17]

Conversely, the testimony regarding Ellmaker's assertion of his Fifth Amendment privilege to remain silent was in answer to a question directly relating to his guilt of the offense, such that a jury could conclude he refused to answer because he was guilty. In fact, that was precisely the inference that the State argued should be drawn in closing argument. "[E]vidence which reflects that the defendant 'clammed up' under circumstances calling imperatively for an admission or denial should not be admitted." *Frazier*, 927 S.W.2d at 380. The trial court erred in admitting into evidence Sergeant Campbell's testimony that Ellmaker refused to answer whether he was driving under the influence.

Having determined that it was a violation of Ellmaker's constitutional rights to allow Campbell to testify about Ellmaker's exercise of his right against self-incrimination as substantive evidence of his guilt, the burden shifts to the State to prove that this "federal

---

[17] In affirming the denial of Ervin's subsequent habeas claim, the United States Court of Appeals for the Eighth Circuit noted that "the crux of a *Doyle* violation is whether the state was permitted to make specific inquiries or arguments about a defendant's post-*Miranda* silence as a way to infer guilt." *Ervin v. Bowersox*, 892 F.3d 979, 984 (8th Cir. 2018) (citing *Greer v. Miller*, 483 U.S. 756, 765-66 (1987)).

constitutional error was harmless beyond a reasonable doubt." *Brooks*, 304 S.W.3d at 137. Under this standard, the State must show "that no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict." *Id.* In determining the effect of a *Doyle* violation on the jury's verdict, we examine four factors: "(1) whether the government made repeated *Doyle* violations; (2) whether the trial court made any curative effort; (3) whether the defendant's exculpatory evidence is transparently frivolous; and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming." *Id.*

Regarding the first factor, the State made repeated *Doyle* violations. The State elicited Sergeant Campbell's testimony about Ellmaker's refusal to answer the question about his guilt and then emphasized the importance of this refusal by asking Campbell whether Ellmaker refused to answer any other questions. In that Campbell was the State's sole witness, the impact of this testimony was considerable. The State committed further *Doyle* violations when it referred to Ellmaker's post-arrest silence in its opening statement and when it argued in closing that his refusal to answer was evidence of his guilt.

As to the second factor, no curative action was taken to ameliorate the effect of the *Doyle* violation. The trial court erred in admitting Sergeant Campbell's testimony and took no effort then or at other times the State addressed (in its opening statement and closing argument) Ellmaker's assertion of his Fifth Amendment Right to remain silent.

With respect to the third factor, Ellmaker's defense was that the State could not carry its burden of proving beyond a reasonable doubt that he had committed the charged crimes. Although Ellmaker did not testify, some testimony favorable to him was elicited during the cross-examination of Sergeant Campbell who testified that he did not report that Ellmaker exhibited slurred speech or incoherence. This defense was not transparently frivolous.

19

As to the fourth factor, the State presented other evidence of Ellmaker's intoxication. Sergeant Campbell received a broadcast of a possibly intoxicated driver matching the description of the vehicle driven by Ellmaker. Ellmaker exhibited six of six clues on the HGN[18] test, which indicated to Sergeant Campbell that Ellmaker was intoxicated. He provided six insufficient air samples on the breathalyzer test, which is treated as a refusal and indicated to Sergeant Campbell that Ellmaker was intoxicated. Sergeant Campbell testified that Ellmaker had bloodshot, watery eyes and that he could smell alcohol when Ellmaker spoke. Ellmaker could not produce his license, registration, or insurance, but instead provided a cell phone bill as proof of his identity. Ellmaker asked at one point if his passenger could drive. He admitted to having "had a few." Additionally, the answers Ellmaker provided to Sergeant Campbell's questions contained inconsistencies. For example, he stated that he had one beer per hour and around three beers total, but he provided a timeline that indicated he had only been drinking for a little over an hour.

While this may certainly constitute evidence of Ellmaker's guilt, the question before us is whether this evidence was so overwhelming that "no reasonable doubt exists that the [erroneously admitted] evidence failed to contribute to the jury's verdict." *Brooks*, 304 S.W.3d at 137. We cannot say that the other evidence of Ellmaker's guilt was so overwhelming that the State's repeated *Doyle* violations were harmless beyond a reasonable doubt.[19] Put another way, it is reasonable to doubt that the erroneously admitted evidence (of Ellmaker's assertion of his

---

[18] "Although indicative of intoxication, a driver's particular score on the HGN test *does not* create a presumption of intoxication. That ultimate conclusion rests with the trier of fact, who is free to believe or disbelieve the officer's testimony and to ascribe the weight given to it." *State v. Rose*, 86 S.W.3d 90, 98 (Mo. App. W.D. 2002).

[19] We note that neither of the other two standard field sobriety tests were conducted to corroborate the results of the HGN test. And, although Sergeant Campbell testified that he observed Ellmaker cross the double lines while driving, the jury was deadlocked on this count.

20

right to remain silent) did not contribute to the jury's guilty verdict – that it is reasonable to conclude that such evidence *could have* contributed to the jury's guilty verdict.

Point two is granted.[20]

### Conclusion

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

/s/ *Thomas N. Chapman*
Thomas N. Chapman, Judge

All concur.

---

[20] As previously noted, because our disposition of Point Two resolves the appeal, we do not separately address the *Doyle* violations raised in Ellmaker's third point.